989 A.2d 1181

**BOARD OF EDUCATION OF WORCESTER COUNTY**

v.

**BEKA INDUSTRIES, INC.**

No. 1924, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Feb. 26, 2010.

670

672

674

James W. Almand (Ayres, Jenksin, Gordy & Almand, PA, on the brief), Ocean City and Leslie R. Stellman, Shani K. Whisonant, Hodes, Pessin & Katz, PA on the brief, Towson, for appellant.

David D. Gilliss (Robert P. O'Brien, Tracy L. Steedman, Niles, Barton & Wilmer, LLP on the brief), Baltimore, for appellee.

Panel: MEREDITH, WRIGHT, GRAEFF, JJ.

GRAEFF, J.

This case arises from a dispute relating to the construction of Ocean City Elementary School ("OCES"), located in Worcester County, Maryland. Appellant, the Board of Education of Worcester County (the "Board"), and appellee, BEKA Industries, Inc. ("BEKA"), entered into a written contract for BEKA to perform the sitework portion of the construction. Disputes arose regarding payment pursuant to the original contract and for additional work that BEKA performed. Following a four-day bench trial in the Circuit Court for Worcester County, the court ruled in favor of BEKA, entering a "compromise" judgment against the Board in the amount of $1,100,000.

On appeal, the Board raises four questions for our review, which we have rephrased as follows:

1. Are BEKA's claims against the Board barred by the doctrine of sovereign immunity?

2. Did the trial court err in prohibiting the Board from submitting evidence regarding its recoupment claim?

3. Is BEKA entitled to damages for delay?

4. Did the trial court's failure to decide legal and factual issues in rendering a compromise verdict constitute reversible error?

For the reasons set forth below, we shall reverse the judgment of the circuit court and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2003, the Board received final approval to go forward with the OCES project, and it received funding of approximately $17.8 million. Dr. Jon Andes, Superintendent of Schools for Worcester County, explained that $4.8 million was contributed by the State, which included contributions from the Board of Public Works and the Interagency Committee on

School Construction, and the rest of the money came from the county government.

OCES was to be completed in two phases, with the construction of the new elementary school in Phase One, and the demolition of the existing elementary school in Phase Two. It was to be a multi-contractor project, with contractors contracting directly with the Board. The Board hired a construction management company, SPN, Inc., to be the school's representative on-site to manage the contractors, and it retained an architectural firm, Cochran, Stephenson & Donkervoet, which was responsible for the overall design of OCES.

In May 2004, BEKA submitted a lump sum bid of $1,856,000 to perform the sitework for the OCES project.[1] James H. Reinhardt, Sr., President of BEKA, testified that "lump sum means that you get your lump sum bid price if you successfully complete the project pursuant to the contract documents." BEKA's bid was accepted by the Board that same month.

On June 8, 2004, BEKA and the Board executed a contract memorializing their agreement.[2] The parties subsequently agreed to three approved change orders, in the amount of $105,913, which increased the total contract price to $1,961,913.48.

BEKA began work in June 2004. The project was scheduled to be completed by December 5, 2005, but there were delays, and BEKA did not complete the work until May 2006.

Disputes arose regarding payment on the project. On October 12, 2007, BEKA filed a Complaint for Money Dam-

---

**1.** BEKA specifically submitted a bid for "Contract Package 1—Sitework/Demolition," which required "the contractor to perform work related to site clearing, excavation, grading, site utilities, curb and gutter, and paving in accordance with the plans and specifications."

**2.** The parties signed a modified American Institute of Architects (AIA) Agreement, entitled AIA Document A101/CMa–1992, "Standard Form of Agreement between Owner and Contractor where the basis of payment is a STIPULATED SUM." This agreement incorporated a second document, AIA Document A207/CMa–1992, which set forth the general conditions of the contract.

ages and Other Relief in the Circuit Court for Worcester County. The Complaint included 49 counts against the Board, including 46 counts asserting breach of contract, and three counts alleging negligent misrepresentation, unjust enrichment and quantum meruit. BEKA sought damages in the amount of $1,157,053.75, in addition to pre-judgment interest, post-judgment interest, costs and attorneys' fees. BEKA alleged that the Board owed $361,991.47 under the initial contract and more than $795,000 for proposed change orders ("PCOs").

On December 7, 2007, the Board filed an Answer. The Answer generally denied liability, stating that the Complaint failed to state a claim upon which relief could be granted. It raised 12 affirmative defenses, including accord and satisfaction, collateral estoppel, estoppel, fraud, illegality, laches, payment, release, *res judicata,* statute of frauds, statute of limitations, and waiver. The Board subsequently filed a second and third amended answer asserting additional defenses, including recoupment and governmental immunity.

Numerous pre-trial pleadings and motions were filed by the parties that relate to the arguments raised on appeal. These will be discussed in more detail, *infra.*

On October 6, 2008, the trial began. BEKA called James Reinhardt, President of BEKA Industries, as its first witness. Mr. Reinhardt explained that BEKA is considered a "heavy civil contractor," and it performs "infrastructure work associated with clearing, excavation and grading, utilities, parking lot construction, [and] things that are not included with the actual construction of a building." Mr. Reinhardt was qualified as an expert in the areas of construction management, sitework and heavy construction, sequence of construction, lost production, defective and incomplete work, and additional costs associated with contract changes. According to Mr. Reinhardt, the Board owed BEKA money on the initial contract, as well as payment for additional work that BEKA was asked to do. Proposed Change Orders ("PCOs") were the method by which BEKA notified the Board of its increased

costs for additional work. Mr. Reinhardt described three categories of PCOs involved in this lawsuit: those which the Board agreed to pay; those partially disputed; and those fully disputed. He stated that BEKA fully complied with the contractual provisions of notice and substantiation when preparing its PCOs.

Lydia Hoover, BEKA's Vice President of Contract Administration, testified that she was directly involved with the PCOs. She sent various correspondence to the Board's construction manager, the project architect, and the Board itself regarding the status of the PCOs and the unpaid balance on the base contract. Despite responses indicating that the construction management company needed more time to review the claims for PCOs, the Board, the construction management company and the project architect were largely unresponsive to BEKA's requests. On July 11, 2007, BEKA wrote a letter to the Board's Superintendent requesting permission to address the issue at a school board meeting.[3] The Board denied this request.

Paul Till, a project manager and consulting engineer with the firm of Hardin Kight Associates ("Hardin"), was BEKA's final witness. Mr. Till testified that BEKA employed Hardin for the OCES project "to provide quality control testing and inspection services during construction." The company performed its work, which consisted of monitoring BEKA's earthwork grading operations to determine its compliance with the contract specifications, from June 23, 2004 to May 5, 2006.

At the conclusion of BEKA's case, the Board moved for judgment in its favor on various grounds. As relevant to this appeal, the Board argued: (1) the defense of sovereign immunity provided a partial waiver for BEKA's negligent misrepre-

---

3. Ms. Hoover explained:

So what we hoped is that we could set forth our position in front of Dr. Andes and the school board and say: "Look, you have a small business here. We're owed in excess of a million dollars. We've been owed this money for a long time, and your construction manager isn't paying us and your on-site person isn't paying us and your architect isn't rendering a decision and we're still unpaid."

sentation claim, capping any recovery at $100,000; (2) it had "only waived [its immunity] for written contracts, not quasi contracts," and therefore, the Board was entitled to sovereign immunity on BEKA's claims for unjust enrichment and quantum meruit; and (3) the claim for damages for delay was prohibited by the parties' contract, and, in any event, they were not timely submitted in accordance with the contract.

BEKA opposed the motion for judgment. It alleged that the defense of sovereign immunity was not applicable to a county entity in contract actions. BEKA argued that it had proven that it was entitled to the damages sought, and that the changes to the contract, submitted through PCOs, were "necessitated by the actions of the board including intentional interference and gross negligence, but primarily by changes to the contract." With respect to the no-damages-for-delay clause in the modified AIA form contract, BEKA argued that it had no force or effect. Alternatively, BEKA argued that the Board's actions had been "so outrageous" that, even if the no-damages-for-delay clause was effective, there was a recognized exception allowing the court "to require the board to reimburse BEKA for its cost incurred." The court denied the Board's motion "in its entirety."

The Board then presented its case. Dr. Jon Andes, the Worcester County Superintendent of Schools, testified that he was responsible for the operation of the entire county school system. He explained that the Board receives funding from the Worcester County government, the State of Maryland, and the federal government, with approximately 75% of the Board's operating budget provided by the county government. He testified that "[s]chool boards in Maryland are fiscally dependent upon county government."

With respect to OCES, Dr. Andes testified that it originally was built in the 1960s, and "at the time that this construction project was envisioned," it was outdated and in need of a renovation. A study revealed that it was more beneficial to build a brand-new school next to the existing school than to renovate the current building. The plan was for the students

to move into the new school after it was constructed, and then the old school would be torn down. Dr. Andes hoped that the students could occupy the new school building in September 2005, but they were not able to move in until the third week of November 2005.

With regard to BEKA's demands for payment, Dr. Andes was aware that BEKA had not been paid for the amounts it demanded, but he explained that payment did not occur because BEKA "was not recognizing [the Board's] back charges." Dr. Andes did not know how much money was left in the construction budget for the project, but he testified that some of the $1,856,000 that was originally set aside to pay BEKA was used to pay other contractors.

Joseph Duncan, a project manager for SPN, Inc., the construction management company responsible for the OCES project, testified regarding various PCOs submitted by BEKA. He explained that in June 2006 a meeting took place with representatives from the project architecture firm, the Board, the construction management company and BEKA, concerning outstanding PCOs on the project. As a result of that meeting, both Mr. Duncan and the project architect agreed that BEKA was entitled to $67,000, which was paid to BEKA in July 2006. Another meeting took place in December 2006. In the spring of 2007, BEKA sent Mr. Duncan additional information about new PCOs, in addition to previously submitted change orders that were rewritten.

Thomas Casey, an architect from the firm of Cochran, Stephenson & Donkervoet, was the project manager for the OCES project. He testified that his duties required him to "review the proposed change order and to see whether the work involved was actually an addition or potentially a subtraction from the contract and then to evaluate or help evaluate the cost of that proposed change order if it was justified." He processed approximately 60 PCOs from BEKA. Mr. Casey testified that, after the December 2006 meeting, some of the disputes regarding payment for BEKA's PCOs were resolved, but approximately $40,000–$50,000 remained unre-

solved. In April 2007, Mr. Duncan received two to three large boxes of "revised and new change order requests" from BEKA. Mr. Casey was "amazed that [he] would be receiving a PCO so long after the completion of the project," and he recommended that the bulk of BEKA's claims be denied. In a letter to the Board dated September 11, 2007, he recommended that the Board pay PCOs in the amount of $85,474. He testified that, in his opinion, the Board of Education did not act in bad faith, nor did it act purposefully or negligently during the bidding process, and neither his firm, the construction management company, nor the Board caused BEKA to be unable to perform its duties under the contract.

Joseph Price, facilities planner for the Board, testified that he was the "point man" for the OCES project. As part of his duties, Mr. Price recorded all activities with the construction manager and the architect, reviewed requisitions, change orders and progress meeting minutes, prepared exhibits for the Board, updated the Superintendent once a month, and "generally monitor[ed] the progress of the work." He reported to the Board about the progress of OCES once a month during the Board's regularly scheduled meetings. According to Mr. Price, the Board still owed BEKA $505,487. Mr. Price testified that he did nothing to interfere with BEKA's performance of its duties under the contract, nor did he observe other contractors interfering with BEKA's work.

In rebuttal, BEKA recalled Mr. Reinhardt. He testified that the Board issued defective bid documents with the sequence of construction not included. Mr. Reinhardt also opined that the action of the Board allowed other contractors on the project to interfere with BEKA's ability to perform their work. He was surprised that the Board characterized BEKA's September 2007 claims as "untimely" because the Board had encouraged BEKA to submit their claims so they could be "reviewed and resolved."

In closing arguments, the parties explained their positions regarding the amount owed on the contract. BEKA argued that the total amount the Board owed was $1,215,035.80. This amount was calculated based on $540,061.33 due under the

base contract, $795,062.36 due for PCOs,[4] minus a credit in the amount of $120,087.88 for work that was removed from BEKA's scope of responsibility. Counsel then added $165,585.49 in prejudgment interest, and he argued that BEKA's "total claim" was $1,380,622.30.

The Board's figures, not surprisingly, were different. It argued that, based on the court's earlier ruling that it could not pursue its recoupment and setoff credits, the amount it owed BEKA was $505,487.[5] The Board arrived at that figure by taking the initial contract sum, and agreed-upon change orders, which totaled $1,961,913, and subtracting the amount that it paid, $1,421,852, which left a balance due to BEKA of $540,061. Counsel added in $85,514 that was due for approved change orders, resulting in a balance due of $625,575. After subtracting the $120,088 credit that BEKA owed the Board for sewer and parking lot work that was removed from its scope of responsibility, the Board owed $505,487 under the contract. The Board argued that $491,247 of proposed change orders sought by BEKA remained in dispute because: (1) they were not timely submitted; and (2) they were damages for delay claims that were prohibited by the contract. Finally, the Board argued that it had partial governmental immunity on the negligent misrepresentation claim.

Immediately after the conclusion of closing arguments, the court issued its ruling from the bench as follows:

Counsel, certainly we have fully aired the issue and I appreciate your advocacy on both sides, but here's the way I see it. I'm disallowing any claim for prejudgment interest

---

4. With respect to money due on PCOs, counsel argued that BEKA was entitled to the following: $17,934.34 on "absolutely undisputed" PCOs; $118,825.27 on "partially disputed" PCOs; and $658,302.75 on "disputed" PCOs.

5. The Board was seeking recoupment and setoff in the amount of approximately $550,000. Its position was that, if it had been permitted to pursue its claim, and proven this claim, it would not owe BEKA any money relating to the OCES project. The court's ruling precluding the Board from presenting evidence on this claim is one of the issues on appeal.

which I'm going to do. I see the claim as being $1,215,035 and I understand that the Board believes the proper amount is $505,487. There's much to be said on both sides on what has been a very unhappy performance of a contract, and the public unfortunately has to pay the brunt of the cost of the contentious attitude of the Board in administering this money.

I'm therefore going to compromise the claim and I'm going to allow $1,100,000 as the judgment against the County or the Board in final resolution of the claims and counterclaims. And that judgment will enter as of today and of course will draw interest from this point.[6]

On October 21, 2008, the Board filed a Notice of Appeal. On October 24, 2008, it filed in the circuit court a Motion to Stay Enforcement of Judgment, asserting that, as a board of education, it had sovereign immunity, which had been partially waived for claims less than $100,000, or the limits of its insurance. The Board stated that it did not have the power to tax or otherwise raise revenue, that there was no insurance coverage for the judgment entered against it, and that, other than the funds remaining in the construction budget, which was less than $75,000, it did not have funds or property to use for payment of the judgment, to post as security for a bond, or to pay into court to stay the judgment while the appeal was pending. The Board requested that the court stay enforcement of the judgment pending appeal.

On November 12, 2008, BEKA filed an Opposition to the Board's Motion to Stay Enforcement of Judgment, arguing

---

6. Maryland Rule 2–601(a) requires that "[e]ach judgment shall be set forth on a separate document." The trial court here announced its ruling from the bench, but it does not appear from the record that the court set forth its ruling in a separate document. It is clear, however, that the court intended its ruling to be a final disposition of all the issues, which is reflected in the docket entries. Accordingly, because of this clear intent, and because neither party objected to the absence of a separate document, we find the separate document requirement waived. See Suburban Hosp., Inc. v. Kirson, 362 Md. 140, 156, 763 A.2d 185 (2000); Collins/Snoops Assocs., Inc. v. CJF, LLC, 190 Md.App. 146, 160 n. 2, 988 A.2d 49 (2010).

that the Board could not raise the defense of sovereign immunity in contract actions, and that the Board's asserted financial condition should not preclude its responsibility to pay the judgment against it. BEKA requested that the court require the Board to obtain a supersedeas bond in an amount sufficient to satisfy the judgment, interest, and costs. On November 17, 2008, the Board filed a reply to BEKA's opposition, requesting that it be allowed to proceed with its appeal without posting a supersedeas bond.

On November 24, 2008, the circuit court held a hearing. The court denied the Board's motion, stating as follows:

I think if you contract to build a school with the school board and then be told, I'm sorry, we don't have any funds, you're out of luck. It's just, to me, absurd.

So the motion to stay enforcement of the judgment is denied and motion for a stay of judgment is denied.

On December 4, 2008, after BEKA filed Requests for Issuance of Writ of Garnishment on Property other than Wages,[7] the Board filed in this Court a Motion to Stay Enforcement of Judgment Pending Appeal. The Board stated that it

genuinely fear[ed] that should this Court deny the requested relief in the form of a stay of enforcement pending appeal, the citizens of Worcester County may well risk a cessation of instructional activities in its public schools, since one potential source of funds which [BEKA], without this Court's intervention, may seek to seize is the Board's teacher and staff payroll accounts.

The Board stated that, even though arguably there was a waiver of its sovereign immunity pursuant to Md.Code (2009 Repl.Vol.), § 12–201 of the State Government Article ("S.G."),[8] "the judgment against the Board in this case is not legally

---

7. Maryland Rule 2–645(b) provides that a "judgment creditor may obtain issuance of a writ of garnishment by filing in the same action in which the judgment was entered a request" for a writ.

8. The statute in effect on June 8, 2004, the date the contract was executed, has undergone no substantive changes. Accordingly, we will refer to the current statute.

enforceable because funds have not been appropriated for the specific purpose of satisfying a money judgment, and the Board is not empowered to provide for such funds by taxation." Additionally, the Board asserted that it "is without the autonomous authority to raise money to furnish a *supersedeas* bond," arguing that "public policy dictates that the *supersedeas* bond requirement is not applicable to the Board in its capacity as a State agency." The Board requested that this Court stay enforcement of the judgment pending appeal.

On December 5, 2008, this Court ordered that enforcement of the judgment against the Board be stayed pending further order of this Court, and it ordered BEKA to show cause why the Board's motion to stay should be denied in whole or in part. On December 10, 2008, the Board supplemented its December 5, 2008, motion with an affidavit from the Superintendent of the Worcester County Public Schools, Dr. Jon Andes, which explained the Board's contention "that there are no judgment-specific funds in the Board's coffers." [9]

On December 15, 2008, BEKA filed an Opposition to the Board's Motion to Stay Enforcement of Judgment Pending Appeal. BEKA argued that "this Court should require the Board to file a supersedeas bond or alternative security in order to maintain the status quo of the parties during the pendency of an appeal and to protect the judgment creditor from the possibility of loss from the delay in satisfaction of the judgment."

On December 19, 2008, this Court granted the Board's Motion to Stay Enforcement of Judgment Pending Appeal on the condition that the Board file "with the Clerk of the Circuit Court for Worcester County by close of business on January 5, 2009, a letter [of] credit from a financial institution or a supersedeas bond in the amount of $1,100,000.00." [10] On

---

9. Dr. Andes stated in his affidavit that approximately $75,000 remained in the construction fund for OCES, and other than that, the Board had no funds to pay the judgment entered against it in favor of BEKA.

10. The Board filed a Petition for Writ of Certiorari from this order, which the Court of Appeals denied on December 30, 2008.

January 6, 2009, the Board filed a Line with this Court, attaching a copy of the $1.1 million check from the County Commissioners of Worcester County that was to be deposited "in a Clerk of the Court interest-bearing account to stay enforcement of the judgment . . . pending the appeal of the judgment."

[1] On March 9, 2009, BEKA filed a motion to dismiss the Board's appeal, arguing that "the Board [ ] failed to timely prepare its portion of the joint record extract" and "failed to file its brief," as required by this Court's briefing schedule and by the Maryland Rules. On April 6, 2009, this Court denied BEKA's motion. On June 22, 2009, BEKA filed another motion to dismiss the Board's appeal, "due to the failure of the Board to submit a legally sufficient record extract." The Board responded with a motion to strike BEKA's motion to dismiss, arguing that it acted in good faith in negotiating the contents of the record extract, that BEKA demanded an overly-inclusive extract, and that the appeal should not be dismissed because this case "is one of great public importance" and the Board "substantially complied" with the rule regarding record extracts. On July 8, 2009, this Court denied BEKA's motion to dismiss the appeal, without prejudice "to appellee's right under Md. Rule 8–501(e) that if the record extract does not contain a part of the record that Appellee believes is material to the issues raised, then appellee may reproduce that part of the record as an appendix." [11]

---

11. In its brief, BEKA included another motion to dismiss the appeal based on its contention that the Board failed to submit a sufficient record extract in accordance with Md. Rule 8–501(c). Maryland Rule 8–501(m) provides: "Ordinarily, an appeal will not be dismissed for failure to file a record extract in compliance with this Rule." Moreover, in *Rollins v. Capital Plaza Assocs., L.P.*, 181 Md.App. 188, 955 A.2d 869, *cert. denied*, 406 Md. 746, 962 A.2d 372 (2008), this Court recognized that "dismissing an appeal on the basis of an appellant's violations of the rules of appellate procedure is considered a 'drastic corrective' measure" and "reaching a decision on the merits of a case 'is always a preferred alternative.' " *Id.* at 202, 955 A.2d 869 (citations omitted). A "drastic" measure is not warranted here. Accordingly, we will deny BEKA's motion to dismiss the appeal.

We shall include additional facts as necessary in our discussion of the issues raised on appeal.

## STANDARD OF REVIEW

In a case tried without a jury, "the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). "Under the clearly erroneous standard, 'we must consider the evidence in the light most favorable to the prevailing party and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence.' " *Royal Inv. Group, LLC v. Wang,* 183 Md.App. 406, 430, 961 A.2d 665 (2008) (citations omitted). "When the trial court's [decision] 'involves an interpretation and application of Maryland statutory and case law, [the appellate court] must determine whether the lower court's conclusions are legally correct....' " *Gebhardt & Smith LLP v. Md. Port Admin.,* 188 Md.App. 532, 564, 982 A.2d 876 (2009) (quoting *Hillsmere Shores Improvement Ass'n v. Singleton,* 182 Md.App. 667, 690, 959 A.2d 130 (2008)), *cert. denied,* 412 Md. 256, 987 A.2d 16 (2010). " 'We make this determination *de novo,* without deference to the legal conclusions of the lower court.' " *Id.*

## DISCUSSION

### I.

#### Sovereign Immunity

The first issue involves the Board's claim that it is entitled to the defense of sovereign immunity in this case. The Board argues that it is a State agency, and the doctrine of sovereign immunity protects State agencies against suits and judgments. It acknowledges that sovereign immunity can be waived by the General Assembly and that, with respect to contract actions, the legislature "has enacted a rather broad statutory

waiver of sovereign immunity governing the State of Maryland, executive branches, and other instrumentalities." *See* S.G. § 12–201(a). The Board contends, however, that S.G. § 12–201(a) is not applicable to county boards of education. It argues that S.G. § 12–201(a) applies to "the State, its officers, and its units," but "[n]either Maryland statutory law nor Maryland common law have defined Maryland county boards of education as units of the Maryland State government."

According to the Board, the legislature has enacted a "more limited" waiver of sovereign immunity for boards of education. It cites to Md.Code (2006 Repl.Vol.), § 5–518(b) of the Courts and Judicial Proceedings Article ("C.J.P."), which provides that "[a] county board of education . . . may raise the defense of sovereign immunity to any amount claimed above the limits of its insurance policy or, if self-insured or a member of a pool described under § 4–105(c)(1)(ii) of the Education Article, above $100,000." The Board argues that, "[g]iven the absence of any insurance to cover construction claims such as those asserted by [BEKA] in this case, the maximum amount for which sovereign immunity is waived under Section 5–518(c) is $100,000."

Going one step further, however, the Board argues that BEKA is not permitted to recover even $100,000. It contends that, even though C.J.P. § 5–518(c) contains a partial waiver of sovereign immunity for claims up to $100,000, "[s]uch a waiver requires specific funds to satisfy the judgment *or* the agency against whom the judgment has been levied must have the power to raise judgment specific funds by taxation." The Board argues that, "[b]ecause [it] does not have a judgment-specific fund and lacks the power to raise funds by taxation, even the limited $100,000 waiver from sovereign immunity . . . provides no support for [BEKA's] right to claim any amount or to execute on the judgment in the instant case." [12]

---

12. The Maryland Association of Boards of Education ("MABE") filed an amicus brief in support of the Board's position. It raises the same arguments that are raised by the Board. Additionally, it contends that, even if the defense of sovereign immunity for contract claims has been

BEKA, by contrast, argues that the Board is not entitled to the defense of sovereign immunity in contract actions, arguing that S.G. § 12–201(a) "expressly waived the immunity defense for the State and its [units], including the Board, in certain contract actions." It states that "there can be no serious dispute that the Board is considered a unit of the State." BEKA contends that the partial immunity found in C.J.P. § 5–518(b) is not applicable to the contract claims here because this statute "applies to insurable claims such as tort claims—not contract actions." [13]

BEKA further disputes the Board's contention that the waiver of immunity is not supported by judgment-specific funds and a means to obtain them. BEKA states that "[t]he Board has paid into the Court's registry sums equal to the amount to satisfy a judgment in the principal amount should such judgment be affirmed by this Court." Thus, it asserts, "any aspect of the argument relating to the alleged insufficient funds should be dismissed as moot." BEKA also argues that the Board has a means to obtain these funds, found in S.G. § 12–203, which "clearly and unambiguously provides for appropriation of funds for the satisfaction of judgments against the State and its instrumentalities."

---

waived, the defense still applies to the tort claims for any amount more than $100,000, but the trial court "failed to specify the basis for its award." MABE contends that the failure to "delineate between those counts to which sovereign immunity applies and those counts to which sovereign immunity does not apply" requires reversal.

13. Two amicus briefs were filed supporting BEKA's position. The Surety & Fidelity Association of America raise essentially the same arguments set forth by BEKA. The brief filed by the American Subcontractors Association, the American Subcontractors Association of Baltimore and the D.C. Metropolitan Subcontractors Association, by contrast, relies on Md.Code (2005 Repl.Vol.), Art. 25(B) § 13(A)(a), which waives sovereign immunity for code counties in contract actions. Moreover, it asks this Court to reject the Board's argument for policy reasons, stating that permitting county boards of education to raise the defense of sovereign immunity in contract claims "would effectively cause virtually all significant school construction and renovation to grind to a halt, harming both the construction industry and the schools."

The Board disagrees with BEKA's argument that the action of the County Commissioners, in making funds available to satisfy the judgment, renders the Board's sovereign immunity argument moot. It argues that the "posting of funds by a third party for the purpose of staving off garnishment proceedings initiated by BEKA, which would have shut down the Worcester County Public Schools in the middle of the instructional year, should not deprive the Board of the opportunity to raise an important legal issue." Relying on its argument that it is not a unit of the State government, the Board maintains that the provision of the State Government Article that provides for the Governor to set aside judgment specific funds, S.G. § 12–203, is not applicable to a county board of education.

██ The parties' arguments regarding the issue of sovereign immunity have varied during the course of these proceedings.[11] That the parties did not make the precise arguments below that they make on appeal, however, does not limit the scope of our review. The defense of sovereign immunity can be raised at any time, even "for the first time on appeal." *Dep't of Pub. Safety & Corr. Servs. v. ARA Health Servs.*, 107 Md.App. 445, 459, 668 A.2d 960 (1995) (citation omitted), *aff'd*, 344 Md. 85, 685 A.2d 435 (1996). *Accord State v. Sharafeldin*, 382 Md. 129, 140, 854 A.2d 1208 (2004) ("State agencies may not, on their own, waive sovereign immunity 'either affirmatively or by failure to plead it.'") (quoting *Dep't of Natural Res. v. Welsh*, 308 Md. 54, 60, 521 A.2d 313 (1986)).

---

14. For example, at the motion for judgment at the end of BEKA's case, the Board asserted the defense of sovereign immunity only with respect to the non-contract claims. At the conclusion of the case, it argued for the defense of sovereign immunity only on the tort claims, stating that it was protected by immunity for tort claims over $100,000, and "for contracts that are not written." It did not argue, as it does on appeal, that the defense of sovereign immunity applied to all of the claims against it. Indeed, in its Motion to Stay Enforcement of Judgment Pending Appeal, the Board stated that, "[f]or purposes of this appeal," it was "prepared to concede the notion that it may be subject to the waiver provisions" in S.G. § 12–201. Similarly, BEKA took a different position in the circuit court, arguing in response to the motion for judgment that the defense of sovereign immunity was inapplicable because the defense did not apply to a county entity in contract actions.

■ The doctrine of sovereign immunity operates to "bar[ ] individuals from bringing actions against the State, thus protecting it from interference with governmental functions and preserving its control over its agencies and funds." *Condon v. State*, 332 Md. 481, 492, 632 A.2d 753 (1993). *Accord Stern v. Bd. of Regents*, 380 Md. 691, 701, 846 A.2d 996 (2004). The doctrine is "firmly embedded in Maryland law, long recognized as applicable in actions—contract, tort, or otherwise—against the State of Maryland, its officers, and its units," *Magnetti v. Univ. of Md.*, 402 Md. 548, 556, 937 A.2d 219 (2007). When a governmental agency has availed itself of the doctrine of sovereign immunity, suit cannot be brought against it " 'unless the General Assembly has specifically waived the doctrine.' " *Id.* at 557, 937 A.2d 219 (quoting *Stern*, 380 Md. at 701, 846 A.2d 996).

■ The Court of Appeals has set forth the following test in determining whether the doctrine of sovereign immunity applies in a particular case: "(1) whether the entity asserting immunity qualifies for its protection; and, if so, (2) whether the Legislature has waived immunity, either directly or by necessary implication, in a manner that would render the defense of immunity unavailable." *Stern*, 380 Md. at 700–01, 846 A.2d 996 (quoting *ARA Health Servs., Inc. v. Dep't of Pub. Safety and Corr. Servs.*, 344 Md. 85, 92, 685 A.2d 435 (1996)). In addition to this two-part test, the Court stated that analysis of a third factor is required: "Even where a statute specifically waives the doctrine, a suit may only be maintained where there are 'funds available for the satisfaction of the judgment' or the agency has been given the power 'for the raising of funds necessary to satisfy recovery against it.' " *Id.* at 701, 846 A.2d 996 (quoting *Univ. of Maryland v. Maas*, 173 Md. 554, 559, 197 A. 123 (1938)). The Court of Appeals recently reiterated that, not only must the Legislature authorize suits for damages, but there must also " 'be provision for the payment of judgments.' " *Brooks v. Hous. Auth. of Baltimore*, 411 Md. 603, 615, 984 A.2d 836 (2009) (quoting *Kee v. State Highway Admin.*, 313 Md. 445, 455, 545 A.2d 1312

(1988)). We will proceed to address the factors in this three-part test.

## A. State Agency

 We start initially with the first factor, "whether the entity asserting immunity qualifies for its protection." *Stern,* 380 Md. at 700, 846 A.2d 996. In other words, we must determine whether a county board of education is a State agency entitled to the defense of sovereign immunity.

This Court has described county boards of educations as "unusual creatures," with a "peculiar hybrid nature," noting that these boards have attributes of both county and State agencies. *Dean v. Bd. of Educ. of Cecil County,* 71 Md.App. 92, 98, 523 A.2d 1059, *cert. denied,* 310 Md. 490, 530 A.2d 272 (1987). In *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.,* 358 Md. 129, 135–36, 747 A.2d 625 (2000), Judge Wilner, speaking for the Court of Appeals, explained the unique nature of county school boards and why they generally are considered to be State agencies:

County school boards are creatures of the General Assembly. *Section 3–103 of the Education Article (ED)* creates such a board for each county, with limited authority to control educational matters that affect the county. *See ED § 4–101.* In 13 counties, the members of the board are elected by the voters of the county (§ 3–114); in Baltimore City, the members of the board, other than a student member, are appointed jointly by the Governor and the Mayor of Baltimore (§ 3–108.1); in the other counties, the members are appointed by the Governor from among the residents of the county (§ 3–108).[15] The county school systems are funded in part by the State and in part by the counties. *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983). Although in terms of their composition, jurisdiction, funding, and focus, they clearly

---

**15.** In Worcester County, members of the board are elected by the voters of the county. Md.Code (2008 Repl.Vol.), § 3–114 of the Education Article ("ED").

have a local flavor, the county school boards have consistently been regarded as State, rather than county, agencies.

County school boards are considered generally to be State agencies because (1) the public school system in Maryland is a comprehensive State-wide system, created by the General Assembly in conformance with the mandate in *Article VIII, § 1 of the Maryland Constitution* to establish throughout the State a thorough and efficient system of free public schools, (2) the county boards were created by the General Assembly as an integral part of that State system, (3) their mission is therefore to carry out a State, not a county, function, and (4) they are subject to extensive supervision by the State Board of Education in virtually every aspect of their operations that affects educational policy or the administration of the public schools in the county.

*Id.* at 135–37, 747 A.2d 625 (footnote omitted) (some citations omitted).

This Court and the Court of Appeals more recently have reaffirmed that a county board of education is a State agency entitled to governmental immunity. *Bd. of Educ. of Baltimore County v. Zimmer–Rubert*, 409 Md. 200, 206, 973 A.2d 233 (2009) (citing cases in support of proposition that the Court of Appeals has "long considered" county school boards to be State agencies); *Norville v. Anne Arundel County Bd. of Educ.*, 160 Md.App. 12, 62, 862 A.2d 477 (2004) (board of education is an agency of the State for purposes of a suit filed under federal and State law), *vacated on other grounds*, 390 Md. 93, 887 A.2d 1029 (2005). Thus, the first factor in the test for assessing whether the doctrine of sovereign immunity applies, whether the entity asserting immunity qualifies for protection, is answered in the affirmative.

## B. Waiver by the General Assembly

The next step is to determine "whether the Legislature has waived immunity, either directly or by necessary implication, in a manner that would render the defense of immunity unavailable." *Stern*, 380 Md. at 700–01, 846 A.2d 996. When considering a waiver of sovereign immunity, the Maryland

appellate courts "have strictly construed such waivers in favor of the sovereign." *Zimmer–Rubert*, 409 Md. at 212, 973 A.2d 233. *Accord Stern*, 380 Md. at 720, 846 A.2d 996 (appellate court must "construe legislative dilution of governmental immunity narrowly").

■ Both parties agree that the General Assembly has waived, to some extent, the defense of sovereign immunity for county boards of education. They disagree, however, as to which statute waives the defense and the extent of the waiver. As indicated, BEKA contends that, pursuant to S.G. § 12–201, the General Assembly waived the defense of sovereign immunity in contract actions. The Board contends that S.G. § 12–201(a) is not applicable to county boards of education, but rather, the General Assembly enacted a "more limited" waiver of sovereign immunity for boards of education in C.J.P. § 5–518, waiving the defense for claims up to $100,000, but providing "absolute immunity for verdicts and judgments above $100,000." BEKA argues, however, that C.J.P. § 5–518 applies only to insurable tort claims. As explained below, we agree with BEKA that S.G. § 12–201(a) is the controlling statute and that the partial waiver in C.J.P. § 5–518(b) is limited to tort actions. Thus, there has been a legislative waiver of a county board of education's defense of sovereign immunity in contract actions.[16]

■ Title 12 of the State Government Article addresses the liability of State agencies and the scope of the doctrine of sovereign immunity. It contains separate statutory provisions regarding tort and contract actions. S.G. § 12–201, enacted in

---

**16.** BEKA does not argue that ED § 3–104(b), which provides that a county board of education "[m]ay sue and be sued," is a legislative waiver of the defense of sovereign immunity. The Court of Appeals previously held that this provision was not an effective waiver of the defense in tort actions because the third prong of the test was not met, *i.e.*, the legislation did not give these boards power " "to raise money for the purpose of paying damages,' " nor " "to pay a judgment against them.' " *Weisner v. Bd. of Educ.*, 237 Md. 391, 394, 206 A.2d 560 (1965) (quoting *Weddle v. Bd. of Sch. Comm'rs*, 94 Md. 334, 343, 51 A. 289 (1902)).

1976 and entitled "Sovereign immunity defense barred," is a waiver of the defense in contract actions. It provides as follows:

> (a) *In general.*—Except as otherwise expressly provided by a law of the State, the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or one of its units while the official or employee was acting within the scope of the authority of the official or employee.[17]

S.G. § 12–104, subsequently enacted in 1981, provides for a waiver of immunity in tort actions.[18]

■■ C.J.P. § 5–518, entitled "Immunity—County boards of education," specifically addresses waiver of the defense of sovereign immunity for county boards of education. Because this statute is more specific than the statutes contained in the State Government Article, it controls to the extent of any inconsistency. *See Magnetti,* 402 Md. at 566, 937 A.2d 219 ("'It is well settled that when two statutes, one general and one specific . . . conflict, the specific statute will be regarded

---

**17.** This statute limits the waiver of the defense of sovereign immunity to written contracts. *Stern v. Bd. of Regents,* 380 Md. 691, 701, 720–21, 846 A.2d 996 (2004); *ARA Health Servs., Inc. v. Dep't of Pub. Safety and Corr. Servs.,* 344 Md. 85, 92, 685 A.2d 435 (1996). Additionally, Md.Code (2009 Repl.Vol.), § 12–202 of the State Government Article, sets forth a one-year filing deadline as a condition precedent to asserting a cause of action for breach of contract that otherwise would have been barred by sovereign immunity. *See Magnetti v. Univ. of Md.,* 402 Md. 548, 568, 937 A.2d 219 (2007).

**18.** Maryland Code (2009 Repl.Vol.), § 12–104(a) of the State Government Article provides as follows:

(a) *In general.*—

(1) Subject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this subsection.

(2) The liability of the State and its units may not exceed $200,000 to a single claimant for injuries arising from a single incident or occurrence.

as an exception to the general statute.' ") (quoting *Maryland–Nat'l Capital Park and Planning Comm'n v. Anderson*, 395 Md. 172, 194, 909 A.2d 694 (2006)). The question here involves whether there is any inconsistency, *i.e.*, does C.J.P. § 5–518 address solely insurable tort claims, as BEKA contends, or does it address both tort and contract claims, as the Board argues.

The specific waiver of immunity set forth in C.J.P. § 5–518 provides, in pertinent part, as follows:

(b) *Claims for more than $100,000.*—A county board of education, described under Title 4, Subtitle 1 of the Education Article, may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or, if self-insured or a member of a pool described under § 4–105(c)(1)(ii) of the Education Article, above $100,000.[19]

(c) *Claims for $100,000 or less.*—A county board of education may not raise the defense of sovereign immunity to any claim of $100,000 or less.

The Board argues that this statute applies to "any claim" against a board of education, including contract claims. It contends that it "is a member of a self-insurance pool which provides no coverage for construction claims," and therefore, "its maximum exposure in this case is $100,000."

BEKA disputes this contention. It argues that "the partial waiver of immunity imparted by § 5–518 applies to insurable claims such as tort claims-not contract actions." BEKA points to a Court of Appeals decision interpreting similar language applying to community colleges and holding that this type of waiver did not apply to contract claims because it "affects only those claims which would be covered by such a 'comprehensive liability insurance' policy." *Charles E. Brohawn & Bros. Inc. v. Bd. of Trustees of Chesapeake College*, 269 Md. 164, 171–72, 304 A.2d 819 (1973).

---

**19.** As set forth in more detail, *infra*, ED § 4-105 requires that county boards of education carry comprehensive liability insurance or be self-insured for property or casualty risks.

In determining the scope of C.J.P. § 5–518, we must apply well-settled principles of statutory construction. These principles were set forth in *Zimmer–Rubert,* as follows:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature. *See Collins v. State,* 383 Md. 684, 688, 861 A.2d 727, 730 (2004). Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology. *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484, 487 (2004).
>
> * * * *
>
> If statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written. *Collins,* 383 Md. at 688–89, 861 A.2d at 730. "If there is no ambiguity in that language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends; we do not need to resort to the various, and sometimes inconsistent, external rules of construction, for 'the Legislature is presumed to have meant what it said and said what it meant.' " *Arundel Corp. v. Marie,* 383 Md. 489, 502, 860 A.2d 886, 894 (2004) (quoting *Witte v. Azarian,* 369 Md. 518, 525, 801 A.2d 160, 165 (2002)).
>
> Nevertheless, we may resort to legislative history to ensure that our plain language interpretation is correct. *See Kramer v. Liberty Property,* 408 Md. 1, 22, 968 A.2d 120, 132 (2009).

409 Md. at 214–15, 973 A.2d 233. The ultimate goal is " 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by [the] particular provision....' " *Canaj v. Baker & Div. Phase III,* 391 Md. 374, 403, 893 A.2d 1067 (2006) (quoting *Davis v. Slater,* 383 Md. 599, 605, 861 A.2d 78 (2004)).

In *Zimmer–Rubert,* the Court of Appeals held that, by its "plain language, § 5–518(c) ... waives the defense of sovereign immunity 'to *any* claim of $100,000 or less,' " stating that

the words "any claim cannot reasonably be read to exclude certain categories of claims." *Id.* at 215, 973 A.2d 233 (quoting *Zimmer–Rubert v. Bd. of Educ. of Baltimore County,* 179 Md.App. 589, 612, 947 A.2d 135 (2008)). *Accord Norville,* 160 Md.App. at 70, 862 A.2d 477. The Court concluded that C.J.P. § 5–518(c) applied to *"all* claims, including those for personal injury and alleged employment law violations.' " 409 Md. at 216, 973 A.2d 233 (emphasis added).

The Board points to the above-cited language in *Zimmer–Rubert* in support of its contention that C.J.P. § 5–518 covers "any claim," including contract claims. Although that argument appears persuasive at first glance, a closer analysis of the case reveals the fallacy in the Board's analysis.

In *Zimmer–Rubert,* 409 Md. at 203, 973 A.2d 233, the Court addressed the applicability of C.J.P. § 5–518 in the context of a claim alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). This type of claim involves personal injury. *See Dobson v. E. Assoc. Coal Corp.,* 188 W.Va. 17, 422 S.E.2d 494, 501 (1992) (discrimination claim is "a species of personal injury akin to tort"). *See also Newell v. Runnels,* 407 Md. 578, 646, 967 A.2d 729 (2009) (discussing tort claim based on termination of employment). Thus, the Court's comment that " 'any claim' cannot reasonably be read to exclude certain categories of claims," *Zimmer–Rubert,* 409 Md. at 215, 973 A.2d 233, must be construed in the context of a tort related claim. The Court did not address in that case, or in any other case that we have found, whether C.J.P. § 5–518 applies to contract claims.

In addressing that issue, we think that the statutory language is ambiguous. Although the statute provides that the defense of sovereign immunity may be asserted for "any amount" above the limit of the Board's insurance policy, and may not be raised for "any claim" less than $100,000, the statutory provisions are tied to the requirements of Md.Code (2008 Repl.Vol.), § 4–105 of the Education Article ("ED"),[20]

---

20. The statute in effect on the date the contract was entered into has undergone no substantive changes. Accordingly, we will refer to the

which requires county boards to carry comprehensive liability insurance or be self-insured for property or casualty risks.

Comprehensive liability insurance generally covers claims for bodily injury and property damage, not breach of contract. *See* 43 Am.Jur. 2d. *Insurance* § 667 (2010) ("A comprehensive general liability policy's sole purpose is to cover the risk that the insured's goods, products, or work will cause bodily injury or damage to property"; it is "not a performance bond."); *Aetna Casualty & Surety Co. of America v. Deluxe Systems Inc.*, 711 So.2d 1293, 1297 (Fla.Dist.Ct.App.1998) (comprehensive liability insurance coverage provides protection for personal injury or property damage). Thus, although the statute uses the words "any claim," it does so in the context of liability insurance, which typically covers tort claims.

---

current statute. ED § 4–105, "**Comprehensive liability insurance; defense of sovereign immunity**," provides as follows:

(a) *Comprehensive liability insurance.*—Each county board shall carry comprehensive liability insurance to protect the board and its agents and employees. The purchase of this insurance is a valid educational expense.

(b) *Standards for policies; coverage.*—The State Board shall establish standards for these insurance policies, including a minimum liability coverage of not less than $100,000 for each occurrence. The policies purchased under this section shall meet these standards.

(c) *Self-insurance; minimum coverage.*—

(1) A county board complies with this section if it:

(i) Is individually self-insured for at least $100,000 for each occurrence under the rules and regulations adopted by the State Insurance Commissioner; or

(ii) Pools with other public entities for the purpose of self-insuring property or casualty risks under Title 19, Subtitle 6 of the Insurance Article.

(2) A county board that elects to self-insure individually under this subsection periodically shall file with the State Insurance Commissioner, in writing, the terms and conditions of the self-insurance.

(3) The terms and conditions of this individual self-insurance:

(i) Are subject to the approval of the State Insurance Commissioner; and

(ii) Shall conform with the terms and conditions of comprehensive liability insurance policies available in the private market.

(d) *Defense of sovereign immunity.*—A county board shall have the immunity from liability described under § 5–518 of the Courts and Judicial Proceedings Article.

To the extent that the statutory language is ambiguous, the appellate courts " 'endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute.' " *Brooks,* 411 Md. at 621–22, 984 A.2d 836 (quoting *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.,* 404 Md. 560, 571, 948 A.2d 11 (2008)). As this Court recently stated:

> "When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal. If the true legislative intent cannot readily be determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions."

*Hurd v. State,* 190 Md.App. 479, 491, 988 A.2d 1143 (2010) (quoting *MAMSI Life & Health Ins. Co. v. Wu,* 411 Md. 166, 176–77, 983 A.2d 88 (2009)).

Our review of the legislative history indicates that when the predecessor to § 5–518 was enacted, it was not intended to waive the defense of sovereign immunity for county boards of education on contract claims. Rather, it was enacted to waive the defense in tort claims, to provide a remedy for students injured on school grounds.

In 1971, a bill passed enacting

> new Section 56B to Article 77 of the Annotated Code of Maryland, (1969 Repl.Vol.), titled "Public Education," subtitle "COUNTY BOARDS of Education" ... to require the several boards of education in the counties and Baltimore City to purchase ... COMPREHENSIVE LIABILITY IN-

SURANCE ... and to allow the boards of education to raise the defense of sovereign immunity TO ANY AMOUNT IN EXCESS OF the limit of liability.

1971 Md. Laws, Chap. 548. As the Court of Appeals noted in *Zimmer–Rubert,* the initial bill required liability insurance for personal injury claims, but the statute ultimately enacted required county boards to purchase comprehensive liability insurance. 409 Md. at 215, 973 A.2d 233.

The statute, as initially enacted in 1971, provided as follows:

§ 56B. **Comprehensive liability insurance**

(a) *Generally.*—The county boards of education and the board of school commissioners of Baltimore City shall carry comprehensive liability insurance to protect the Board and its agents and employees. The purchase of such insurance shall be considered as an educational purpose and as a valid educational expense.

(b) *Standards and guidelines for policies.*—The State Board of Education shall adopt regulations setting up standards and guidelines for the policies including a minimum liability coverage, and the policies purchased under this section, after the adoption of these regulations, shall conform to them.

(c) *Self-insurance.*—Any of the above boards of education shall be considered in compliance herein if they are self-insured under rules and regulations promulgated by the State Insurance Commissioner. Liability shall be limited to one hundred thousand dollars ($100,000) for each injury, the policy limits for this insurance shall not exceed one hundred thousand dollars ($100,000).

(d) *Defense of sovereign immunity.*—Nothing in this section shall be construed as affecting the right of the various boards of education, on their own behalf, from raising the defense of sovereign immunity to any amount in excess of the limit of the limit of the liability.

Md.Code (1957, 1971 Cum.Supp.), Art. 77 § 56B.

Initially, we note that in subsection (c) the statute limited liability to $100,000 for each "injury." That language is

consistent with an intent that the statute apply to tort, rather than contract, claims.

Moreover, the circumstances leading to the enactment of the statute support a finding that it was intended to apply to tort claims. There is no official legislative history for this 1971 law because, at that time, the General Assembly did not preserve bill files. *See Conaway v. Deane*, 401 Md. 219, 247, 932 A.2d 571 (2007) (noting that "legislative bill files were not retained systematically by the General Assembly's Standing Committees or the Department of Legislative Reference (now known as the Department of Legislative Services) until 1975"). There are, however, press reports that reveal that the bill was introduced in response to a catastrophic personal injury suffered by a student on school grounds.[21] *See Id.* at 247–48, 932 A.2d 571 (noting that "archival newspaper accounts" may be helpful in determining legislative history for pre–1975 legislative action); *In Re: Jason W.*, 378 Md. 596, 601, 837 A.2d 168 (2003) (reviewing newspaper articles to determine intent of 1970 legislation when no official legislative history existed). Thus, the language of the statute as originally enacted, and the newspaper article indicating that the intent of the statute was to require counties to carry insurance to protect against claims for personal injury, supports a finding that § 5–518 applies only to tort claims.

---

**21.** A March 15, 1971 article in the Washington Post reported as follows:

A Montgomery County Delegate urged a legislative committee today "to do justice" to Maryland citizens by enacting a partial repeal of the ancient doctrine of sovereign immunity that prevents lawsuits against the State.

Legislation, sponsored by Del. Lucille S. Maurer, would require all public school boards in the State to carry insurance protecting themselves and employees against damage claims for personal injuries....

The problem of public school liability has been given fresh emphasis by the plight of [a student] ... who suffered a broken neck in 1968 while performing trampoline exercises at Prince George's Coughlin High School.

Lawrence Meyer, *Md. Bill Proposes Liability Insurance For All Schools*, WASH POST, Mar. 15, 1971, at B2. The student was reported to be a quadriplegic as a result of the accident. *Id.*

Nothing in the subsequent legislative history suggests an intent to expand the scope of this limited waiver of the defense of sovereign immunity beyond tort claims. In 1972, the statute was amended to provide that the liability insurance that the county boards of education were required to purchase "shall not be less than one hundred thousand dollars ($100,-000) per occurrence." 1972 Md. Laws, Chap. 507. Subsection (d) was revised as follows:

> (d) Nothing in this section shall be construed as affecting the right of the various boards of education, on their own behalf, from raising the defense of sovereign immunity to any amount in excess of the limit of [liability] *the policy* OR IN EXCESS OF ONE HUNDRED THOUSAND DOLLARS ($100,000) IN THE CASE OF SELF–INSURANCE.

In 1974, the General Assembly revised subsection (d) of § 56B. The statute was revised as follows:

> (D) THE SEVERAL BOARDS OF EDUCATION ON THEIR BEHALF MAY RAISE THE DEFENSE OF SOVEREIGN IMMUNITY TO ANY AMOUNT IN EXCESS OF THE LIMIT OF THE POLICY OR IN EXCESS OF $100,000 IN THE CASE OF SELF–INSURANCE. *IN ANY CASE, THE SEVERAL BOARDS OR ANY BOARD OF EDUCATION MAY NOT RAISE THE DEFENSE OF SOVEREIGN IMMUNITY IN ANY CLAIM OF LESS THAN $100,000.*

1974 Md. Laws, Chap. 792. Thus, it was in 1974 that the "any claim" language was added to the statute.

Documents in the bill file indicate that this 1974 change was "[f]or the purpose of restating in an affirmative manner those provisions regarding the defense of sovereign immunity as they apply to public education." 1974 Md. Laws, Chap. 792. Nothing suggests that this revision was intended to change the scope of the waiver of the defense of sovereign immunity.

In 1978, this section was moved to the Education Article. ED § 4–105, entitled "Comprehensive liability insurance; defense of sovereign immunity," provided that the county board

"shall carry comprehensive liability insurance," with a "minimum liability coverage of not less than $100,000 for each occurrence," and provided that a board could elect to be self-insured. Subsection (d) provided as follows:

> *Defense of sovereign immunity.*—(1) A county board may raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or if self-insured, above $100,000.
>
> (2) A county board may not raise the defense of sovereign immunity to any claim of $100,000 or less.

Md.Code (1978), ED § 4–105(d).

In 1990, all of Maryland's immunity provisions were consolidated in the Courts and Judicial Proceedings Article. *See Houston v. Safeway Stores, Inc.*, 346 Md. 503, 697 A.2d 851 (1997). The purpose of this legislation was described as follows:

> This bill consolidates the provisions in the Annotated Code of Maryland that concern immunity from liability, limitations on liability and prohibited actions. **It makes no substantive changes in the law.** Its purpose instead is to consolidate the current provisions on immunities, limitations on liability and other prohibited actions in the Courts and Judicial Proceedings Article, for ease of reference.

Bill Analysis of H.B. 206 (1990) (emphasis added). At that time, the statutory language that currently is found in C.J.P. § 5–518(c) and (d) was enacted.[22]

Our review of the legislative history of C.J.P. § 5–518 leads us to conclude that the intent of the General Assembly in enacting this statute was to require county boards of education to carry liability insurance to protect against claims of bodily injury and property damage, and to waive the defense of sovereign immunity to the extent of the board's insurance, or if self-insured, to $100,000. Nothing in the legislative

---

22. Initially the provisions dealing with sovereign immunity for county boards of education were found in C.J.P. § 5–353, but in 1997, they were transferred to § 5–518. 1997 Md. Laws, Chap. 14.

history indicates an intent to waive the defense of sovereign immunity for contract claims, as opposed to tort claims.

Indeed, although the precise issue raised in this case has not previously been decided by the Maryland appellate courts, there is precedent to support the position that § 5–518 applies to tort, and not contractual claims. In *Brohawn*, 269 Md. 164, 304 A.2d 819, the Court of Appeals interpreted a provision similar to § 5–518 and found that it did not apply to contract claims. *Id.* at 171–72, 304 A.2d 819. In that case, the Court addressed a 1971 law providing that a board of trustees of a community or regional community college "shall carry comprehensive liability insurance to protect the board, its agents and employees," and further providing that nothing in that section was to be construed as affecting the right of the boards of trustees from raising the defense of sovereign immunity "to any amount in excess of the limit of the policy or in the excess of one hundred thousand dollars ($100,000) in the case of self-insurance." *Id.* at 171, 304 A.2d 819. The Court of Appeals stated: "It is clear to us that this is only a partial waiver of sovereign immunity," and "affects only those claims which would be covered by such a 'comprehensive liability insurance' policy." *Id.* at 171–72, 304 A.2d 819. Accordingly, the Court held that this statute did not apply to the breach of contract claim in that case. *Id.*

The Court in *Brohawn* was construing a statute waiving sovereign immunity for the board of a community college, which statute was enacted at the same time as the statute governing county boards of education and contained virtually the same language. The Court's conclusion that the language used constituted a waiver of sovereign immunity only for tort claims, and not contractual claims, is equally applicable here.[23]

---

**23.** The Court of Appeals in *Bd. of Educ. of Baltimore County v. Zimmer-Rubert*, 409 Md. 200, 206, 973 A.2d 233 (2009), did not cite, much less overrule, the decision in *Brohawn*. That lends support to our conclusion that it was addressing the scope of tort claims covered by § 5–518, and it did not address whether § 5–518 constituted a waiver of contractual claims.

■■■ Accordingly, we hold, based on the Court of Appeals' prior construction of language similar to that found in C.J.P. § 5–518, and the clear legislative intent of the General Assembly in enacting the statute, that § 5–518 is a legislative waiver of the defense of sovereign immunity for a county board of education only with respect to tort claims. It is not a legislative waiver of the defense for contract claims. Thus, the language of § 5–518, limiting the liability of a self-insured board of education to $100,000, does not apply to BEKA's contract claims against the Board.[24]

### S.G. § 12–201(a)

■■■ We next address whether, as BEKA contends, S.G. § 12–201(a) constitutes a legislative waiver of the Board's sovereign immunity regarding its contract claims. The Board argues that § 12–201(a) does not apply to county boards of education. Although acknowledging that these boards have been characterized as state agencies, the Board contends that they are not units of the Maryland State government. We are not persuaded.

The issue whether to waive sovereign immunity for the State and its agencies was "the subject of considerable study by the Legislature in the mid–1970[s]." *Sharafeldin*, 382 Md. at 138, 854 A.2d 1208.

> Bills to waive immunity in breach of contract actions were passed in 1974 and 1975 but were vetoed by the Governor, who preferred to await the result of a comprehensive study of the matter by a gubernatorial Commission that had been created to examine the issue. In an interim report made in February, 1976, the Commission recommended a conditional waiver of immunity in contract actions, and that report served as the basis for the enactment of what is now

---

**24.** The complaint here contained both contract and tort claims. The trial judge did not specify on which claims he was granting judgment in favor of BEKA. As discussed, *infra*, we are reversing the judgment and remanding for a new trial. On remand, if there is a judgment against the Board, the circuit court should delineate whether it is based on the contract and/or the tort claims.

codified in SG §§ 12–201 and 12–202. *See* 1976 Md. Laws, ch. 450.

*Id.* The ultimate decision to enact the 1976 statute was predicated on a belief "that there exists a moral obligation on the part of any contracting party, including the State or its political subdivisions, to fulfill the obligations of a contract." *Magnetti,* 402 Md. at 562 n. 6, 937 A.2d 219 (quoting 1976 Md. Laws, Ch. 450).

The statute, as initially enacted in 1976, waived the defense of sovereign immunity for the State "and every officer, department, agency, board, commission or other unit of State government." Md.Code (1976 Cumm. Supp.), Art. 41, § 10A. When the statute was recodified in the State Government Article in 1984, the statute was revised, providing that it applied to "the State its officers and its units." Md.Code (1984), S.G. § 12–202(a).[25] According to the Report on Senate Bill 50, issued on January 27, 1984, the reason for this change was as follows:

> The present law contains numerous lists such as "departments, boards, commissions and other units" or uses terms such as "State agencies" to encompass the listed entities. Throughout the State Government Article, the word "unit" is substituted as a general term for a governmental organization.

The statute included "new language derived *without substantive* change." Revisor's Note, 1984 Md. Laws, Chap. 284. Accordingly, the word "unit" in what is now S.G. § 12–201(a) encompasses entities deemed to be State agencies. And, as discussed, *supra,* county boards of education generally are considered to be State agencies.

The Board argues, however, that, given the unique nature of county boards of education, they are not "units" of State government for purposes of S.G. § 12–201(a). The Board points to *Chesapeake Charter,* 358 Md. at 145–46, 747 A.2d

---

25. S.G. § 12–202 was transferred to § 12–201 in 1986. 1986 Md. Laws, Chap. 265.

625, where the Court of Appeals held that county boards were not a "unit" under State procurement law. In that case, the Court of Appeals addressed a procurement dispute between school bus contractors and the Anne Arundel County Board of Education. *Id.* at 131, 747 A.2d 625. The issue presented was whether the procurement of services by a county board of education was subject to the State's General Procurement Laws, which applied to "each expenditure by a *unit* under a procurement contract." *Id.* at 134, 747 A.2d 625. The Court stated that, "although the county boards are generally regarded as State agencies because they are part of the State public education system, are subject to extensive supervision and control by the State Board of Education, and exercise a State function, from a budgetary and structural perspective, they are local in character." *Id.* at 139, 747 A.2d 625. The Court held that, for structural or budgetary purposes, county boards of education were not considered "as units within the Executive Branch of the State government," *id.* at 137, 747 A.2d 625, and therefore, a county school board was not a "unit" subject to the General Procurement Law. *Id.* at 145, 747 A.2d 625.

 As this Court stated in *Norville,* 160 Md.App. at 58–59, 862 A.2d 477, the Court in *Chesapeake Charter* " 'recognized only a limited exception with respect to budgetary matters and procurement.' " It did not change the principle that, generally, a county board of education is a State agency. *Id.* Accordingly, we hold that, in the context of this case, the Board is a "unit" of the State pursuant to S.G. § 12–201, and this statute waives its right to the defense of sovereign immunity in contract actions.[26]

### Necessary Funds to Satisfy Judgment

 Having found a legislative waiver of the doctrine of sovereign immunity with respect to contract claims, we turn to the third step, whether there are " 'funds available for the

---

**26.** As explained *infra,* the exception to the general rule that county boards of education are state agencies is relevant to the next step of the analysis, but not to this step.

satisfaction of the judgment' or the agency has been given the power 'for the raising of funds necessary to satisfy recovery against it.'" *Stern*, 380 Md. at 701, 846 A.2d 996 (quoting *Maas*, 173 Md. at 559, 197 A. 123). As indicated, not only must the General Assembly authorize suit, but "there must be provision for the payment of judgments." *Brooks*, 411 Md. at 615, 984 A.2d 836 (quoting *Kee*, 313 Md. at 455, 545 A.2d 1312). The burden of proving the availability of funds to satisfy the judgment is on the party seeking to show a waiver of the defense of sovereign immunity, in this case, BEKA. *See Stern*, 380 Md. at 712.

The Board contends that it does not have a judgment specific fund to pay the million dollar judgment against it, and it lacks the power to raise funds by taxation. *See Zimmer-Rubert*, 179 Md.App. at 602, 947 A.2d 135 ("county boards have no independent taxing authority."). Accordingly, the Board argues, "there was no waiver of the Board's sovereign immunity in this case."

BEKA disputes the contention that the waiver is not supported by judgment specific funds and the means to obtain them, for two reasons. First, BEKA argues that the waiver of sovereign immunity for contract actions in S.G. § 12–201 was accompanied by a mechanism for appropriation of funds to satisfy a final judgment. Second, BEKA contends that the County Commissioners of Worcester County paid into the court's registry funds to satisfy the 1.1 million dollar judgment, and therefore, it contends that "the Board's argument that no judgment-specific funds are available is moot."

We address first the argument that the General Assembly provided a mechanism for appropriation of funds to satisfy a judgment on the contract claims in this case. S.G. § 12–203, entitled "Budget requests to satisfy judgments," provides: "To carry out this subtitle, the Governor shall include in the budget bill money that is adequate to satisfy a final judgment that, after the exhaustion of the rights of appeal, is rendered against the State or any of its officers or units." To be sure, this provision generally would satisfy the

funding requirement for State agencies. As indicated, however, school boards are "unusual," "hybrid" agencies. *See Dean,* 71 Md.App. at 98, 523 A.2d 1059. These boards, while State agencies for most purposes, "are not normally regarded for structural or budgetary purposes, as units within the Executive Branch of the State government." *Chesapeake Charter,* 358 Md. at 137, 747 A.2d 625.

In *Chesapeake Charter,* the Court of Appeals explained that, while the State provides funding for county school boards, it does not give the funds directly to the school boards, and the boards are subject to the county, not State, budget process:

As we indicated, the State currently provides approximately 42% of the current operating revenues of the county boards.[27] Most of those funds are appropriated by the General Assembly to the State Department of Education for pass-through to the county boards, either in conformance with the basic current expense sharing formula set forth in *ED § 5–202* or pursuant to other State aid provisions in title 5 of that article[ ]. . . . *None of the major appropriations for operating expenses are made directly by the General Assembly to the county boards. The county boards prepare and submit their annual budgets to the respective county governments which, subject to certain limitations and requirements, have ultimate approval power over them. See ED §§ 5–102 and 5–103;* 76 Op. Atty. Gen. 181, 184 (1991). The State Department of Education, the Governor, and the General Assembly are not directly involved in the budget process for the county boards.

What this statutory scheme reveals is that, although the county boards are generally regarded as State agencies because they are part of the State public education system, are subject to extensive supervision and control by the State Board of Education, and exercise a State function, from a budgetary and structural perspective, they are local in

---

27. The testimony in this case, eight years after *Chesapeake Charter* was decided, was that the county provided approximately 75% of the operating budget for the Worcester County Board of Education.

character. They are not divisions of or units within the State Department of Education. *They are subject to the county, not the State, budget process and must justify their budget requests to the county government. Most of their operational funding comes from the county, not the State, government. When these factors are taken into account, it is clear that the general characterization of county boards of education as State agencies does not require a finding that they are entities "in the Executive Branch of the State government" for purposes of SFP § 11–101(x).*

*Id.* at 139–40, 747 A.2d 625 (emphasis added).

■ Because county boards of education are subject to the county budget process, it does not appear that the State would be responsible for paying a judgment against a county board of education. Indeed, although the Maryland Attorney General typically represents State agencies in lawsuits, ED § 4–104 authorizes county school boards to retain their own counsel, which the Board did in this case. Accordingly, S.G. § 12–203 does not provide a mechanism for appropriation of State funds to satisfy a judgment against a county board of education.

■ In the absence of a statutory mechanism providing for funding to satisfy a judgment, the waiver of the defense of sovereign immunity for a county board of education in contract actions is ineffective, "unless funds have been appropriated for the payment of such damages as may be awarded, or the Board is authorized to raise funds for that purpose." *Bd. of Trustees of Howard Community College v. John K. Ruff, Inc.,* 278 Md. 580, 591, 366 A.2d 360 (1976). BEKA has the burden to show that funds are available to the Board to pay the judgment. *See Stern,* 380 Md. at 712, 846 A.2d 996 (finding that appellants "did not satisfy their burden" to satisfy the last prong of the test).

■ The issue of whether funds are available "is a question of fact, not law." *Ruff,* 278 Md. at 592. In *Ruff,* the controversy regarding the liability of the Board of Trustee's of Howard Community College, on a contract to construct a facility, turned on whether funds were available. The Court

stated: "If funds are available, the waiver of sovereign immunity is complete, and an action for a money judgment for breach of the contract would lie. On the other hand, if funds are not available, such action would be precluded by the application of the doctrine of sovereign immunity." *Id.* at 595, 366 A.2d 360. Because the record in *Ruff* was insufficient to answer that question, the Court remanded for further proceedings to ascertain whether funds were available to the Board to pay the amount due pursuant to the contract. *Id.* at 596, 366 A.2d 360.

Similarly, here, the record is not sufficient for this Court to resolve the third prong of the analysis regarding the defense of sovereign immunity. It may be that funds are available to the Board. To the extent that there is money remaining from the funding of the initial contract, presumably these funds would be available.[28] Moreover, BEKA has argued in this Court that the Board has "a $1.2 million 'contingency fund' to cover contingencies that may arise," that the Board has funds in a "construction funds" account, and that the Board had the authority to "transfer funds from one account to another."[29] None of these assertions were raised below, however, and the trial court did not make any finding of fact regarding the

28. Conflicting evidence was presented regarding money left in the construction budget that would be available to pay BEKA. At trial, Joseph Price, facilities planner for the Board, testified that $87,000 remained in the construction budget. In an affidavit filed in this Court to Supplement the Board's Motion to Stay Enforcement of Judgment Pending Appeal, however, Superintendent Andes stated that approximately $75,000 remained in the construction budget. Superintendent Andes further testified that some of the money in the construction budget that was originally set aside to pay BEKA on the base contract price "was used to pay other contractors."

29. Section 5–305 of the Education Article provides, in relevant part:
(a) Separate accounts required for construction funds. Each county board shall keep:
(1) All money for the construction of public school buildings and public school facilities and the purchase of land for public schools in a separate account from that used for current expenses; and
(2) A separate and independent accounting system for all public school construction money.

existence, or not, of available funds. Thus, we cannot determine on appeal whether there are funds available to allow for an effective waiver of the defense of sovereign immunity.

BEKA contends, however, that there are available funds to pay the judgment because the County Commissioners of Worcester County issued a check to the clerk of the circuit court in the amount of 1.1 million dollars to stay enforcement of the judgment pending appeal. This argument might be persuasive if we were affirming the judgment of the circuit court. As discussed *infra*, however, we are reversing the judgment and remanding for a new trial.

 The purpose of an appeal bond is to stay execution of the judgment pending appeal. *Kvedera v. Mondravisky*, 149 Md. 374, 383, 131 A. 766 (1926). If the judgment is affirmed, the obligors on the bond must pay the judgment. *Id.* at 384, 131 A. 766. If the judgment is reversed, however, "the obligation of the appeal bond becomes void." *Nat'l Surety Co. v. Schafer*, 57 Colo. 56, 140 P. 199, 202 (1914). *Accord Kennedy v. Miller*, 174 Ill.App.3d 48, 123 Ill.Dec. 861, 528 N.E.2d 406, 410 (1988) (when money judgment reversed, defendant not thereafter liable on its appeal bond for satisfaction of the reversed judgment or any new judgment that may be entered against it on retrial); *Spooner Constr. & Tree Serv., Inc. v. Maner*, 314 Mont. 268, 66 P.3d 263, 267 (2003) (where judgment for which bond was posted was not affirmed, bond must be permitted to lapse, and it does not remain effective on remand); *Amwest Surety Ins. Co. v. Graham*, 949 S.W.2d 724, 727 (Tex.App.1997) (when appellate court reverses judgment, "surety on the bond issued to secure payment of the reversed judgment is released and discharged as a matter of law; it is not liable for a new judgment rendered on remand").

 Accordingly, where the deposit made by the County Commissioners was made to stay enforcement of the judgment pending appeal, and this judgment is being reversed, the County has no further liability regarding the reversed judgment. Therefore, the check issued to stay enforcement of the

judgment on appeal cannot be counted as funds available for satisfaction of any judgment on remand.

Thus, in the event that there is a new trial, and a judgment is entered against the Board on the contract claims, there will need to be evidence presented, and a factual finding by the circuit court, regarding whether there are funds available to satisfy the judgment.

## II.

### The Board's Recoupment Defense

The Board next contends that "it was entitled to recoup $531,080 because certain work under this agreement was not performed by BEKA." It argues that the trial court erred in refusing to allow it "to present its $531,080 recoupment defense and claim."

The Board asserts that the court improperly struck its amended answers and its counterclaim seeking recoupment on the ground that they were untimely and caused "unfair prejudice" to BEKA. This ruling was erroneous, according to the Board, because the pleadings were not untimely. Moreover, the Board contends that, because it clearly set forth its claim for credits early in the litigation, there was no unfair prejudice to BEKA. Indeed, the Board argues that its recoupment defense was encompassed in its initial answer.

BEKA has a different take on the court's ruling precluding the Board's recoupment claim. It argues that this issue was decided on BEKA's motion for partial summary judgment and, therefore, the issue is not whether the court properly struck "the Boards's late-filed and prejudicial pleadings," but whether the trial court properly granted the motion for summary judgment. BEKA contends that the court properly granted the motion for summary judgment because the Board did not provide any material facts to dispute BEKA's contention that the Board was not entitled to back charges based on its failure to follow the procedures set forth in the contract for litigating a claim. With regard to the Board's ability to raise the

defense of recoupment at trial, BEKA argues that, once the Board no longer had an affirmative claim for recoupment, the court properly precluded the Board from putting on evidence of the back charges. In the alternative, BEKA argues that the trial court did not abuse its discretion when it struck the Board's amended answers and counter-complaint as untimely.

In its reply, the Board vigorously disputes BEKA's contentions, stating that "it was not BEKA's or the trial court's position at the motions hearing or at trial" that the trial court's ruling on BEKA's motion for partial summary judgment eliminated the "Board's defense or claim based on recoupment, credits, back charges and/or set-offs." Rather, the Board contends that the trial court's actions and the absence of a written summary judgment order led it to believe "that its recoupment defense/claim was not decided on the merits on summary judgment." The Board's position is that, under these circumstances, it is unfair and contrary to the record for BEKA to argue that the Board's recoupment claim was disposed of by summary judgment. In addition, the Board argues that, "even if the Court's summary judgment ruling could be interpreted to encompass the recoupment issue, such a ruling would have been erroneous [because] [t]here were triable issues of material fact on this issue as plainly reflected in the record." The Board refers to the affidavit of Mr. Casey, who stated that there were back charges against BEKA and that neither party followed the contract requirement for submitting claims, nor did they seem concerned with the failure to comply with the statutory requirements.[30]

## A. Summary of Proceedings Below

Because the parties dispute the procedural history leading to the ruling that the Board could not present evidence of its recoupment claim, it is necessary to address exactly what

---

**30.** In a letter to the Board, Mr. Casey specifically stated that "[g]iven the large amount of backcharges against BEKA we do not recommend making any payment until all outstanding issues are settled."

happened below. After reviewing the proceedings, it is clear why there is confusion regarding the basis for the circuit court's ruling.

After the Complaint was filed on December 7, 2007, the Board filed its initial Answer, which generally denied liability. On December 10, 2007, the court issued a Scheduling Order, providing that discovery was to be concluded 30 days before trial. The trial initially was set for June 16–24, 2008, but it subsequently was moved to August 18–26, 2008.

On July 14, 2008, the Board filed an Amended Answer, adding its contention that it was entitled to "credits, backcharges, and/or set-offs (totaling $531,079.52)." The Amended Answer alleged that BEKA refused or failed to perform the work as set forth in the contract, and as a result, and as it was authorized to do under the contract, the Board had the work performed by other contractors. On July 14, 2008, the Board also filed a Counter–Complaint raising the same claim, that it was entitled to "credits, backcharges, and/or set-offs (totaling $531,079.52)" against the amount due to BEKA under the Agreement.

On July 18, 2008, BEKA filed a "Motion to Strike Counter–Complaint and Amended Answer," pursuant to Md. Rule 2–331.[31] BEKA asserted that, pursuant to the original Scheduling Order, the discovery deadline was July 18, 2008. It argued that BEKA "w[ould] be extremely prejudiced if this Court allow[ed] the late filing of the Board's Counter–Complaint or Amended Answer, as BEKA w[ould] be unable to conduct discovery on the issues raised in the Board's Counter–Complaint without leave of Court to conduct additional discovery."

---

**31.** Maryland Rule 2–331(d) addresses the time for filing counterclaims and cross-claims:

(d) *Time for filing.*—If a party files a counterclaim or cross-claim more than 30 days after the time for filing that party's answer, any other party may object to the late filing by a motion to strike filed within 15 days of service of the counterclaim or cross-claim.... The court shall grant the motion to strike unless there is a showing that the delay does not prejudice other parties to the action.

The Board disputed that assertion, stating that its counter-claim for "credits, backcharges, and set-offs" had been raised on several occasions, including during discovery conducted by the parties, during the settlement conference, and in conversations between counsel early in the case. It argued that, because BEKA had been informed of its claim, there was no prejudice that may have resulted from the "tardy filing of its Counter–Complaint." With respect to its Amended Answer, the Board contended that it was timely pursuant to the scheduling order, and therefore it was properly filed without leave of the court.[32] The Board argued that the scheduling order required amendments to pleadings to be filed at least 20 days prior to the trial date, and the Amended Answer was filed "over 30 days prior to the trial date."

On July 18, 2008, the Board filed a Second Amended Answer raising the affirmative defenses of assumption of risk and contributory negligence and stating that the Board "was entitled to recoupment credits," in addition to back charges and/or set-offs in the amount of $531,079.52. BEKA filed a motion to strike the Second Amended Answer, characterizing the Board's amended answer as "nothing more than an untimely counterclaim disguised as an Answer." It argued that it would be extremely prejudicial to BEKA for the court to accept this answer because discovery was then closed. The Board again argued that, pursuant to Md. Rule 2–341(a), it

---

32. Maryland Rule 2–341 addresses the amendment of pleadings:

(a) *Without leave of court.*—A party may file an amendment to a pleading without leave of court by the date set forth in a scheduling order or, if there is no scheduling order, no later than 30 days before a scheduled trial date. Within 15 days after service of an amendment, any other party to the action may file a motion to strike setting forth reasons why the court should not allow the amendment....

(b) *With leave of court.*—A party may file an amendment to a pleading after the dates set forth in section (a) of this Rule only with leave of court. If the amendment introduces new facts or varies the case in a material respect, the new facts or allegations shall be treated as having been denied by the adverse party. The court shall not grant a continuance or mistrial unless the ends of justice so require.

was entitled to amend its answer without leave of the court as long as it was in compliance with the scheduling order.

On July 29, 2008, BEKA filed a Motion for Partial Summary Judgment on the ground that there was no dispute of material facts regarding: (1) a contract balance of $361,991.47 owed; (2) $18,008.19 owed for 15 fully approved proposed change orders; and (3) $67,487.05 in partial payments that the Board agreed to pay on 13 outstanding PCOs. In addition, BEKA alleged that "there are no material facts in dispute with regard to the impropriety of the backcharges assessed by the Board against BEKA." BEKA argued that "the backcharges asserted against BEKA were not pursued in accordance with the contract," and therefore, "the undisputed facts show that the Board waived its right to make these claims under the contract by failing to pursue the contractual procedures for preserving [them]."

On August 18, 2008, the Board filed a Response to BEKA's Motion for Partial Summary Judgment, stating that, "[w]hile it is true that many of the counts in [BEKA's] Complaint are not disputed by [the Board], that does not equate to [BEKA] being entitled to summary judgment in any amount because [the Board] has a claim for recoupment amounts, credits, backcharges and setoff totaling $531,980." The Board argued that, "[u]ntil the Court receives evidence on [the Board's] recoupment amounts, credits, backcharges and offsets, asserted as both defense(s) and counterclaim(s), no decision can be made or judgment entered with respect to a monetary award to [the Board.]" The Board attached a September 11, 2007, letter from Mr. Casey, the architect on the OCES project, which stated that he recommended that the Board make no payment to BEKA at that time, "[g]iven the large amount of backcharges against BEKA." The Board further supplemented its response with Mr. Casey's affidavit, which stated: "Neither BEKA nor [the Board] adhered to the strict time limits or process for submitting PCOs or claims to me, and, until several months before litigation being initiated, neither party offered significant complaints about the lack of adherence to the time limits or process."

On July 29, 2008, the same day that it filed the Motion for Summary Judgment, BEKA filed a Motion *in Limine* to Exclude Evidence of Defendant's Backcharges, alleging that the Board had not provided sufficient information on these claims. Although the Board disputed this claim, it filed a motion for continuance, noting that BEKA had three pending motions before the court seeking to prevent the Board from claiming or presenting evidence of recoupment, credits, back charges or set-offs, and stating that, "if any of the three motions filed by [BEKA]" are determined by the Court to have merit, the Board was requesting "that the case be continued and that the Court order the parties to mediation." On August 13, 2008, the circuit court ordered that the trial be continued from August 18, 2008, to October 6, 2008, and it further ordered that the parties attend mediation.[33]

On August 12, 2008, the Board filed a Third Amended Answer, which was identical to its prior answers, except that it added the affirmative defense of governmental immunity. BEKA again filed a motion to strike the Board's latest answer, stating that it had been "severely prejudiced by the Board's delay in filing its counterclaim, which has been disguised as its Third Amended Answer." The Board responded that "[t]he continuance of the trial date re-set the deadlines as set forth in the Court's scheduling Order," and it argued that the motion was "timely under the revised schedule for the case."

On September 18, 2008, the circuit court held a hearing on the motions. The court granted BEKA's Motion to Strike the Board's Counter–Complaint and Amended Answer, stating that "[t]he fact that discovery closed just four days before the Board's filing of its Countercomplaint unfairly prejudiced BEKA, and the Board's Countercomplaint and Amended Answer are stricken."

Next, the court addressed BEKA's Motion for Partial Summary Judgment. BEKA argued that it was undisputed that

---

**33.** Counsel for the Board advised that mediation occurred in August 2008. Obviously, it was unsuccessful.

there was a contract balance of $361,991.47 due on the original contract. It also argued that summary judgment was appropriate regarding the PCOs. With respect to the Board's recoupment claim and defense, BEKA contended that "the back-charges are completely out for many reasons, but, most importantly, the Board did not follow the contract." Specifically, it argued that a party making a claim for the payment of money was required to give notice and "back-up for the claim" within a certain time frame, and that "submission and a ruling by the architect on a claim of back-charges, is a condition precedent to litigation." [34] BEKA contended that the Board did not follow these procedures, and the claim for back-charges was "not ripe for litigation."

In response, the Board first attempted to clarify what was at issue before the court, noting that BEKA's Motion for Summary Judgment appeared to be addressing the recoupment claim/defense that was used in the Board's counter-complaint and Amended Answer, which the court had stricken as untimely. Receiving no clarification, the Board addressed the issue of recoupment, stating that the contract provided that no amount was due until all issues of credits and back charges were resolved. It argued that, "until this Court hears the whole case and determines a final amount due, it would be inappropriate or error for the Court to enter a judgment for BEKA." BEKA noted in rebuttal that the Board did not address BEKA's argument that it failed to "adhere to the contract provisions for asserting a claim."

The court then ruled as follows:

---

**34.** The contract provided, in this regard:

**Section 4.7.1** Definition: Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be made by written *notice on the Contractor's stationary[.] [M]eeting minutes and facsimile transmission will not be considered written* notice. The responsibility to *substantiate Claims* shall rest with the party making the Claim.

All right. Here's the way I see it, BEKA's Motion for Partial Summary Judgment should be denied as it relates to outstanding PCOs.

If the Board's counterclaim for back-charges is stricken, then the Motion for Partial Summary Judgment should be granted as it pertains to the remaining contract balance, as the Board has failed to provide any reason for not paying the $361,991.47 that still remains due under the original contract.

The clause in the general conditions that provide for withholding of payment does not apply to this amount because, even if the Board is required to make payment on any of the outstanding PCOs, BEKA is still owed the contract balance.

As to BEKA's Request for Summary Judgment on the issue of credits, back-charges and setoffs, the Board failed to address BEKA's argument that it did not adhere to the contract provisions for asserting a claim and the Board should be precluded from raising the issue at this time.

The Board advised the court that it had responded to BEKA's argument, pointing to the affidavit of the architect, which stated that both sides were untimely in submitting claims and that neither side had complained about the failure to strictly comply with the terms of the contact. The court stated that this document did not change its ruling.

The court then began to address BEKA's Motion to Strike the Board's Second Amended Answer. Counsel for the Board again tried to clarify the basis for the court's earlier rulings, stating that he thought that when the court struck the counter-complaint, it was also striking the Board's amended answers. Neither counsel for BEKA nor the court could recall the scope of the earlier ruling. Counsel for BEKA suggested, however, that the earlier ruling addressed only the initial amended answer, but the rationale for striking that answer, based on its late filing, applied to the second and third amended answers. Counsel for the Board stated that he amended the answer three different times, and "in each

instance they were filed well within the Scheduling Order requirement, well within the Maryland Rule requirement." Accordingly, counsel asked that the court deny BEKA's motion to strike these amended answers.

The court subsequently denied BEKA's Motion to Strike the Board's Second and Third Amended Answers and the following exchange between BEKA and the court ensued:

[BEKA]: You're denying the Motion to Strike?

COURT: I'm denying your last motion.

[BEKA]: Well, Your Honor, just for point of clarification, the original ruling by the Court was that the Amended Answer as originally filed was—that the Motion to Strike that was granted. And if the Amended Answer was—where there was an Amended Answer filed subsequent, that the prejudice remains the same, so we should have, to be consistent, the same ruling with regard to subsequent pleadings which contained the same amendment—Amended Answer and—

After further discussion, the court stated: "My original ruling is going to stand."

The court then heard argument on BEKA's Motion *in Limine* to Exclude Evidence of the Board's Back–Charges. BEKA moved to strike on the basis that they had "no way of dealing with it in terms of discovery" and because "the back-charges have already been stricken." The Board argued that it wanted to present the recoupment defense "to whittle down the amount" to which BEKA was entitled because, "to the extent BEKA didn't do work, it shouldn't get paid for it under the contract." BEKA responded again that the Board had not produced documents in discovery in support of its recoupment claim.

At the conclusion of the argument of counsel, the following dialogue took place:

COURT: So what do you want me to do?

[BEKA]: Well, Your Honor, what I want you to do is exclude this—to grant our motion to strike this evidence.

COURT: I thought the motion—

[BOARD]: Your Honor, if I could—

COURT:—was to strike Board's Second Amended Answer?

[BOARD]: We're on the Motion in Limine, Your Honor. We're on the Motion in Limine.

[BEKA]: Right, right.

COURT: To exclude evidence of the Board's back-charges?

[BOARD]: Yes, sir; that's where we are.

[BEKA]: That's correct, Your Honor. That's—that's—

[BEKA]: Right, Your Honor. And the back-charges have already been stricken by Your Honor's prior ruling.

COURT: So I say, if that's been done—

[BEKA]: Right.

[BOARD]: Well, but the—we're now talking about more general evidence that goes to our defense, Your Honor. You've agreed that the Answers that we filed could remain, and one of our defenses is the recoupment.

Your Honor, if you could appreciate that all the documents that support any position that the Board is taking that BEKA didn't do the work and so shouldn't get paid for it has been in the hands of BEKA, both from the Board's documents, as well as the construction manager's documents, and they've had it since February, March, April, when they did all the photocopying at the Board and at SPN.

So there's nothing new that we want to present on this issue. It's simply old evidence, old documents that they've had. We produced it, SPN produced it and a number of contractors produced it. And Mr. O'Brien, in all of the depositions, questioned each witness about most of, if not all of, what we're talking about.

So there is absolutely no prejudice. It's simply our—as I showed you on that Exhibit 1 for the hearing, it's our support for why they don't get paid for work they didn't do.

COURT: I'm going to reserve judgment on that until the trial, which will take place in two weeks.

On October 6, 2008, the Board filed a Motion for Reconsideration of, to Alter or Amend, or to Vacate the Court's Order Granting Partial Summary Judgment in BEKA's Favor, arguing that the judgment "should be reconsidered, revised, and/or vacated, because the Court has not yet heard evidence on, considered, or ruled upon [it's] defense of 'recoupment, back charges, credits, and set-offs' in the amount of $531,080.00." The Board argued that it "should be given an opportunity at trial—in particular, through its recoupment defense—to challenge [BEKA's] entitlement to any amount it seeks."

Prior to the start of the trial that day, BEKA reiterated its previous requests: (1) that the court strike the Board's second and third amended answers, which the court had previously denied; and (2) that the court bar any evidence of recoupment as an affirmative defense, which the court had reserved ruling on at the motions hearing on September 18, 2008. The basis of BEKA's renewed request was twofold: (1) the court's striking of the Board's Counter–Complaint, which asserted recoupment as an affirmative claim, precluded it from asserting recoupment as a defense; and (2) the second and third amended answers should be stricken as unfairly prejudicial, just as the Board's Counter–Complaint and initial amended answer had been. The Board responded that the second and third amended answers were timely filed, in accordance with both the Maryland Rules and the Scheduling Order, that there was no prejudice by their filing, and that the general issue plea asserted in the Board's original answer raised the issue of recoupment.

The court then struck the second and third amended answers and barred "any evidence of recoupment as an affirmative answer." The court did not state on the record the reasons for its ruling, but comments that it made suggest that it was based on a finding that the issue of recoupment was not timely raised. The court stated that "we've been fooling around with this case for three years now and that's why I'm

here to dispose of the case." [35]

After the court issued its ruling, the Board asked for further clarification:

[BOARD]: Your Honor, a point of clarification. I understand you struck my second and third amended answers.

COURT: Correct.

[BOARD]: But I take it that you also made an even further ruling and that you are striking our ability to put anything on with respect to recoupment?

COURT: That's correct.

[BOARD]: And the basis for that is, Your Honor?

COURT: I've given the basis for it.

[BOARD]: Could you enlighten me? I—

COURT: No, just have a seat. Anything else you want to say?

[BOARD]: I don't know the basis for striking the recoupment.

COURT: Well, I'm sorry. Anything else?

[BOARD]: Well, no, not at this point.

During the Board's closing argument, the Board's ability to present evidence relating to its claim and defense of recoupment was again discussed:

[BOARD]: We're furthermore, Your Honor, behind the eight ball to use a phrase because when we came to court on Monday we fully intended in reliance on the Court's ruling on September 18, 2008 to pursue our setoff, recoupment, back charges, and credits as a defense as allowed by Maryland Law. We relied on the Court's ruling on September 18th where you did not strike our second amended answer and you didn't strike our third amended answer. But on Monday we were surprised to come into this court and have

---

**35.** The trial court previously had made comments about delay in the case, stating "somebody has been delaying this beyond compare," and "that's been the name of this case, postpone, postpone, postpone." These comments are curious, given that trial occurred less than one year after the complaint was filed.

[BEKA] stand up and ask you to in effect change that ruling which you did. So the point is the Board has not been able to present to Your Honor our defenses which are—

COURT: All right. Well, let's present it now.

[BOARD]: Well, I can't because the case is finished.

COURT: No, that's just more delay.

## B. Discussion of Court's Ruling

Before addressing the propriety of the court's ruling, we will discuss the nature of a recoupment claim. The Court of Appeals has explained recoupment as "a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of the same transaction on which the adversary's claim is based...." *Imbesi v. Carpenter Realty Corp.*, 357 Md. 375, 380, 744 A.2d 549 (2000). This Court has stated:

> Recoupment is sometimes spoken of as a rule of strict justice, or as based on the principle that it is just to settle both sides of a transaction at once.... The doctrine of recoupment does not allow one transaction to be offset against another, but only permits a transaction which is made the subject of suit by the plaintiff to be examined in all its aspects and a judgment to be rendered that *does justice in view of the transaction as a whole.*
>
> Recoupment exists in equity as well as at common law, and has been said to be *equitable in nature. It reduces the claim affirmatively urged so far as in reason and conscience it ought.*

*Smith v. Smith,* 79 Md.App. 650, 662, 558 A.2d 798 (1989) (quoting 20 AM.JUR.2D, *Counterclaim, Recoupment and Setoff* § 6 (1965)).

The ruling at issue is the trial court's ruling on the day of trial granting BEKA's motion *in limine* to exclude evidence of the Board's recoupment claim. We review this type of decision under an abuse of discretion standard. *Saxon Mortgage Servs. v. Harrison,* 186 Md.App. 228, 252, 973 A.2d 841 (2009). Judicial discretion has been explained as " 'a

composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' " *State v. Wilkins,* 393 Md. 269, 279, 900 A.2d 765 (2006) (quoting *Gunning v. State,* 347 Md. 332, 351, 701 A.2d 374 (1997)). This abuse of discretion standard " 'requires a trial judge to use his or her discretion soundly and the record must reflect the exercise of that discretion.' " *Cooley v. State,* 385 Md. 165, 175, 867 A.2d 1065 (2005) (quoting *Jenkins v. State,* 375 Md. 284, 295, 825 A.2d 1008 (2003)).

As explained, the parties here take completely different positions regarding the basis for the court's ruling excluding evidence of the Board's recoupment defense. In light of the procedural history, set forth, *supra,* this is not surprising. The court initially struck the counter-complaint and amended answer alleging recoupment and setoff, finding that they were untimely and unfairly prejudicial. It then granted BEKA's request for summary judgment, ruling that the Board was precluded from raising the issue of credits, back-charges and setoff's. Subsequent to these rulings, however, the court denied BEKA's motion to strike the Board's second and third amended answers, which raised the defense of recoupment, and were filed after the initial amended answer. The court then addressed BEKA's motion *in limine* to exclude evidence of the Board's back-charges, which BEKA contends had already been disposed of by the motion for summary judgment, and reserved on this motion. At trial, the court reversed course again and struck the second and third amended answers and barred "any evidence of recoupment as an affirmative defense." When counsel for the Board asked for clarification regarding the basis for the decision, the court refused to explain, stating that it had already given the reason. And finally, after all the evidence was presented, and the Board was giving its closing argument, discussing its inability to present its recoupment defense, the court inexplicably said "present it now."

On this record, we are unable to determine the basis for the court's ruling excluding the Board's evidence of recoupment. The inherent contradictions in the court's statements indicate that there was not a sound exercise of discretion in excluding this evidence. Accordingly, we find an abuse of discretion.

■ Moreover, to the extent that any basis for the ruling could be gleaned from the record, it suggests that the ruling may have been based on a finding that the recoupment issue was not timely raised. If that was the trial court's finding, it was erroneous. Even if the counter-claim and amended answers were untimely, we agree with the Board that its initial answer preserved the defense.

■ The Board characterizes its initial answer as a general issue plea and argues that a general issue plea properly raises the defense of recoupment. *See Billingsley v. Kelly,* 261 Md. 116, 121, 274 A.2d 113 (1971) (recoupment allowable under general issue plea when claim arises from same contract). The general issue plea, however, "was deleted in the 1984 rules revision." JOHN A. LYNCH & RICHARD W. BOURNE, MODERN MARYLAND CIVIL PROCEDURE § 6.7(c)(1) (2004). Nevertheless, Md. Rule 2–323(d) "retains the general issue plea of common law pleading." *Ben Lewis Plumbing, Heating & Air Conditioning, Inc. v. Liberty Mut. Ins. Co.,* 354 Md. 452, 466, 731 A.2d 904 (1999). Rule 2–323(d) allows for a general denial in certain types of cases, providing: "When the action in any count is for breach of contract, debt, or tort and the claim for relief is for money only, a party may answer that count by a general denial of liability."

■ In *Ben Lewis,* the Court of Appeals stated: "In the causes specified in § (d) in which a general denial is filed, it is not necessary for the pleader to assert 'every defense of law or fact' in the answer, except for those specifically enumerated in § (g)."[36] 354 Md. at 466–67, 731 A.2d 904. Recoupment is

---

**36.** Maryland Rule 2–323(g) provides:

(g) *Affirmative defenses.*—Whether proceeding under section (c) or section (d) of this Rule, a party shall set forth by separate defenses:

not one of the affirmative defenses that must be specifically pled.

Accordingly, because this suit involved claims of breach of contract and tort, and because recoupment is not one of the affirmative defenses required to be specifically asserted as a defense, the recoupment defense was preserved by the Board's initial answer generally denying liability. Thus, to the extent that the trial court's ruling excluding the Board's evidence of recoupment was based on a finding that the defense was not timely asserted in the amended answers, the decision was erroneous.[37]

## III.

### Damages for Delay

▇▇▇ The Board next argues that the trial court improperly awarded BEKA relief for "almost $500,000 of delay damages," which it contends were prohibited by the parties' contract. It lists the following five counts of the complaint that sought delay damages:

In Count 23 (PCO 86), BEKA demanded $27,237 for costs allegedly incurred from March 24 to April 4, 2006 while waiting for Marcor to remove debris from a ballfield and play area. In Count 40 (sewer), BEKA claims $92,473 for costs allegedly incurred from February to August 2005 waiting for sanitary sewer changes. In Count 42 (PCO

---

(1) accord and satisfaction, (2) merger of a claim by arbitration into an award, (3) assumption of risk, (4) collateral estoppel as a defense to a claim, (5) contributory negligence, (6) duress, (7) estoppel, (8) fraud, (9) illegality, (10) laches, (11) payment, (12) release, (13) res judicata, (14) statute of frauds, (15) statute of limitations, (16) ultra vires, (17) usury, (18) waiver, (19) privilege, and (20) total or partial charitable immunity.

37. On remand, the court can address the contention that the Board is not entitled to present its recoupment defense because it failed to follow the procedures set forth in the contract for asserting a claim. Neither party addressed whether a defense of recoupment, as opposed to an affirmative complaint, would be subject to the claims procedure set forth in the contract.

104), BEKA demands $299,081 for costs allegedly incurred from November 21, 2005 through April 4, 2006 due to delays. In Counts 44 (PCO 106) and 45 (PCO 107), BEKA claims $29,558 for costs allegedly incurred waiting for instructions on topsoil installation and completion of the playground.

The Board takes the position that the clear terms of the contract precluded delay damages, providing that an extension of time was the Contractor's sole remedy against the Board for delay.[38] The provisions on which the Board relies are found in § 8.3, entitled "DELAYS AND EXTENSIONS OF TIME." Section 8.3.1 addresses the circumstances in which a contractor could request an "extension of completion time due to conditions over which the contractor has no control" or other causes that may justify delay. The contract clearly provides: **"Extension of time shall be Contractor's sole remedy for delay."** (Emphasis added). The Board notes that § 8.3.3 of the standard AIA Agreement, which provides, "Section 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents," was deleted from the parties' agreement. The Board contends that the deletion of this provision further emphasizes that an extension of time to perform would be BEKA's sole remedy for delay.

The Board raises an additional argument why a large portion of the delay damages were not recoverable. It argues that, "of the $448,349 in delay damages" sought by BEKA, approximately $420,000 is for claims that were not timely submitted pursuant to the contract.

BEKA does not dispute the validity of a no-damages-for-delay clause in a contract, but it argues that the portion of the contract cited by the Board does not preclude its recovery of damages in this case. It sets forth several reasons in support of that argument. First, BEKA argues that § 8.3.1 is not as

---

**38.** The Board points out that § 6.2.5 of the contract provided BEKA with a remedy against another contractor delay.

broad as the Board suggests, but rather, it was modified by other provisions in the contract.[39] Second, it contends that the counts identified by the Board did not seek delay damages. Rather, BEKA asserts, it sought costs incurred for additional work, extra work, and hindrances, disruptions, and impacts to its work, costs that are not precluded by a no-damage-for-delay clause. Third, BEKA argues that, even if its claims constitute delay damages, the no-damages-for-delay clause here is unenforceable because the delay resulted from intentional interference by the Board. Finally, with respect to the contention that BEKA did not submit claims timely, BEKA contends that this assertion "is false."

In *State Highway Admin. v. Greiner Engineering Sciences, Inc.,* 83 Md.App. 621, 577 A.2d 363, *cert. denied,* 321 Md. 163, 582 A.2d 499 (1990), this Court discussed no-damages-for-delay provisions. This Court noted that the "funding structure of public agencies necessitates inclusion of such clauses in public contracts." *Id.* at 639, 577 A.2d 363. We explained:

> Stipulations like the ["no damages for delay" clause] are obviously conceived in the public interest in *protecting public agencies contracting for large improvements on the basis of fixed appropriations or loan commitments* against the vexatious litigation based on claims, real or fancied, that

---

**39.** BEKA explains:

> Section 2.3.1 allows the contractor equitable adjustments to the contract time *and* sum for a suspension of work *"for costs actually incurred at the Project site* by reason of such suspension." ... Section 4.7.1 defines "claim" as including a demand for payment of money or contract time, without limiting the amount or type of compensation available.... Section 4.7.6 entitles a contractor to an equitable adjustment increasing both the contract time *and* the contract sum for additional work arising out of differing site conditions.... Section 4.7.8.1 requires the contractor to provide the Board with an estimate of the cost of any delay the contractor incurs.... Section 6.1.1 allows the contractor to request compensation for additional costs and delays.... Section 6.2.3 provides, in part, that "[c]osts caused by delays or improperly timed activities ... *shall be borne by the party* [to the Contract] *responsible therefore."* ... Section 9.7.1 allows the contractor compensation for delays under certain conditions.

the agency has been responsible for unreasonable delays. . . .

*Id.* at 639, 577 A.2d 363 (quoting *Anthony P. Miller, Inc. v. Wilmington Housing Authority,* 165 F.Supp. 275, 281 (D.Del. 1958)).

In *Greiner,* the "no-damages-for-delay" clause provided:

The Consultant agrees to prosecute the work continuously and diligently and no charges or claims for damages shall be made by him for any delays or hindrances, from any cause whatsoever during the progress of any portion of the services specified in this Agreement. Such delays or hindrances, if any, may be compensated for by an extension of time for such reasonable period as the Department may decide. Time extensions will be granted only for excusable delays such as delays beyond the control and without the fault or negligence of the consultant.

*Id.* at 625, 577 A.2d 363.

In interpreting this provision, this Court applied the objective law of contract interpretation. *Id.* at 635, 577 A.2d 363. It explained this process as follows:

A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean. As a result, when the contractual language is clear and unambiguous, and in the absence of fraud, duress, or mistake, parol evidence is not admissible to show the inten-

tion of the parties or to vary, alter, or contradict the terms of that contract.

*Id.* at 638–39, 577 A.2d 363 (quoting *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261–62, 492 A.2d 1306 (1985)).

This Court held that the provision at issue in *Greiner* "clearly and unambiguously" precluded recovery of delay damages. *Id.* at 639, 577 A.2d 363. The Court stated, however, that there were circumstances in which such a provision would not be enforced:

> This is not to say that unambiguous no-damage-for-delay clauses will be enforced in every case. The better reasoned approach does not enforce the exculpatory clause where there is "intentional wrongdoing or gross negligence," [or] "fraud or misrepresentation" on the part of the agency asserting the clause.

*Id.* (citations omitted).

In the present case, § 8.3.1 of the contract provides: "Extension of time shall be Contractor's sole remedy for delay." This contract provision is unambiguous, and as did the provision in *Greiner,* it clearly precludes damages for delay. Moreover, § 8.3.3 of the form AIA agreement, which would have allowed damages for delay provided for in other provisions of the contract, was crossed out. We agree with the Board that the parties nullified other provisions in the contract that may have allowed damages for costs incurred due to delay. Thus, the contract here clearly precluded BEKA from recovering damages for delay.

We next assess BEKA's claim that the damages sought under counts 23, 40, 42, 44, and 45 of the complaint are not delay damages, but rather, "are direct costs incurred at the Project site due to, among other things, additional work, changed conditions, differing site conditions, suspension of work, impacts, disruptions, and hindrances damages." A determination whether the damages sought here are delay damages is a factual issue for the trier of fact. *See Greiner,* 83 Md.App. at 630 n. 4, 577 A.2d 363 (declining to address

argument on appeal that damages were not barred by no-damages-for-delay clause because they were impact damages, not delay or hindrance damages, concluding that this was a factual issue). The trial court, however, made no findings of fact in this regard.

Similarly, the trial court made no finding with respect to BEKA's next claim, *i.e.*, that even if the complaint asserted delay damages, the no-damages-for-delay provision was unenforceable because the Board's actions amounted to "intentional interference, gross negligence, misrepresentation and/or fraud, [thereby] prohibiting the enforcement of any arguably valid no damages for delay provision under Maryland Law." The Board disputed this claim,[40] but the trial court made no factual finding on this issue.

Maryland Rule 2–522(a) requires a trial court, in a contested court trial, to "prepare and file or dictate into the record a brief statement of the reasons for the decision and the basis of determining any damages." The court did not comply with that Rule here. It merely stated the amounts that each side believed that the Board owed to BEKA, *i.e.*, $1,215,035 according to BEKA, and $505,487 according to the Board,[41] and it stated that it was "going to compromise the claim" and enter judgment against the Board in the amount of $1,100,000.

On this record, we cannot ascertain the basis for the court's judgment. Because the court entered a "compromise" verdict, it cannot be argued that it found in favor of BEKA on all grounds argued by BEKA. Thus, we do not know on what counts the court found in favor of BEKA. With respect to the argument that several counts improperly asserted damages

---

**40.** On appeal, the Board contends that the "wrongdoings" alleged by BEKA do not equate to "intentional interference." Rather, the Board states that they "represent a disgruntled contractor's view of the overall management of the OCES project, with the benefit of 20/20 hindsight."

**41.** As indicated, this was the amount the Board believed was owed pursuant to the contract and agreed upon PCOs, absent its claim for recoupment in the amount of $531,080 for work it alleged BEKA did not perform.

for delay, we cannot ascertain if the court found: (1) as a matter of law, that the contract did not preclude delay damages; (2) as a matter of fact that the damages sought were not delay damages; (3) as a matter of the fact that the damages sought were for delay, but the Board's actions prevented enforcement of the no-damages-for-delay provisions; or (4) that some of the claims were not timely submitted pursuant to the terms of the contract.

Under these circumstances, we cannot determine whether the court committed error. Accordingly, we shall reverse and remand for a new trial.

**APPELLEE'S MOTION TO DISMISS APPEAL DENIED. JUDGMENT REVERSED. CASE REMANDED FOR A NEW TRIAL. COSTS TO BE PAID BY APPELLEE.**